James HARRIS, et al. *v.* Kenneth ROBERTSON, et al.

91-66                                        813 S.W.2d 252

Supreme Court of Arkansas
Opinion delivered July 8, 1991

*Ian W. Vickery*, for appellants.

*Compton, Prewett, Thomas & Hickey*, by: *William I. Prewett*, for appellees.

ROBERT H. DUDLEY, Justice. In this appeal of a boundary line dispute, we set aside a finding of fact by the chancellor and hold that the boundary line was established by acquiescence.

The facts, as viewed in the light most favorable to the appellees, are as follows. Gary and Brenda Stratton acquired eleven (11) acres of land about four (4) miles north of El Dorado in 1975. They lived in the house located on the eleven-acre tract for only a short time before they decided that they wanted a new house. In planning to build the new house they decided to divide the eleven-acre tract by selling three (3) acres, which included the existing house, and retaining the other eight (8) acres on which to

build their new house. They offered to sell the existing house and three acres through a realtor. In 1977, Kenneth and Virginia Robertson accepted the offer. At this time there was no legal description of the three-acre tract. Consequently, Gary Stratton and Kenneth Robertson walked over the land, agreed on the boundaries, and fixed all corners and turning points with iron pins. The Strattons next hired a surveyor, F.M Methuin, and requested that he determine the legal description of the three (3) acres according to the location of the iron pins. The surveyor completed his work in April of 1977 and gave the parties a legal description that was used in the warranty deed from the Strattons to the Robertsons. Unfortunately, the legal description was in error and did not describe the tracts according to the agreed line. It described the three-acre tract as extending about fifteen (15) feet into the eight-acre tract on the west side and as extending a few feet into the eight-acre tract on the north side. At the time, however, no one knew of the error in the deed.

In 1983, the Strattons sold their eight-acre tract to the Evanses. The boundaries were again represented as being the iron pins. The Stratton's deed to the Evanses described the eleven (11) acres but excepted the three (3) acres deeded to the Robertsons. Thus, the Evanses' deed contained the same error. In 1988, the Evanses conveyed the eight-acre tract to James and Sandra Harris. The Harrises used the same description but also thought the iron pins represented the boundaries. Soon thereafter, the Harrises decided to build a fence on the boundary line as marked by the iron pins. They set fence posts along the line between iron pins and began construction of the fence.

The Robertsons apparently thought that some of the fence posts extended past the iron pin line and onto their property. They employed a surveyor, Ted Pill, to shoot a line for the posts. Mr. Pill's measurements showed that some of the fence posts were a little out of line according to the iron pins, but that according to the legal description, the Harrises were fifteen (15) feet over onto the Robertson's land. The Harrises repositioned the fence posts to be on the iron pin line.

The Robertsons then employed another surveyor, Samuel Ball, to conduct a complete survey of their property and plot the results. He entered the bearings and distances in a computer

plotter and found the line as described in the deeds was in fact about fifteen (15) feet west of the line established by the pins. He testified that the first surveyor who set out the original metes and bounds description of the three-acre tract made an error in computing the angles and that caused the difference. In 1988, the Robertsons sued the Harrises and asked for the removal of the fence on the iron pin line. The chancellor held that the description in the deed prevailed over the iron pin line and ordered the fence removed.

In *Seidenstricker* v. *Holtzendorf,* 214 Ark. 644, 217 S.W.2d 836 (1949), this court set out rather completely our law on boundaries by acquiescence. We wrote:

> Acquiescence, by owners of adjoining lands, in a boundary line, as shown by a division fence, for more than seven years will ordinarily confirm the boundary line as thus located, even though the fence may not be placed on the true line between the tracts.

In the case of *Gregory* v. *Jones,* 212 Ark. 443, 206 S.W.2d 18, dealing with a question similar to the one involved here, we said: "In *Goodwin* v. *Garibaldi,* 83 Ark. 74, 102 S.W. 706, Mr. Justice Riddick, in sustaining a long-existing boundary between adjacent owners, quoted the classic language of Hon. U.M. Rose, as found in *Cunningham* v. *Brumback*, 23 Ark. 336: ' . . . better that ancient wrongs should be unredressed than that ancient strife should be renewed.' *Robinson* v. *Gaylord*, 182 Ark. 849, 33 S.W.2d 710, is another case in which an old line was sustained, even against a new survey. Appellee argues that the original rail fence line was established by a mutual mistake and should be changed to the 1946 line, and cited *Randleman* v. *Taylor,* 94 Ark. 511, 127 S.W. 723, 140 Am. St. Rep. 141, as authority for such contention. Furthermore, appellee says that there was no *dispute* prior to the establishing of the rail fence line, so—appellee says—the rule stated by Chief Justice Hart in *Robinson* v. *Gaylord, supra,* and restated in *Peebles* v. *McDonald,* 208 Ark. 834, 188 S.W.2d 289, does not apply to this case. It is true that in this case the original rail fence line was

established without a prior dispute as to boundary; but the recognition of that line for the many intervening years (34 in this case) shows a quietude and acquiescence for so many years that the law will presume an agreement concerning the boundary. In *Deidrich v. Simmons,* 75 Ark. 400, 87 S.W. 649, there had been no dispute prior to the establishment of the fence line which had been accepted as the common boundary for many years; and in that case Justice McCulloch, speaking for this court said: 'The proprietors of adjacent lands may by parol agreement establish an arbitrary division line, or an agreement may be inferred from long-continued acquiescence and occupation according to such line, and they will be bound thereby.' So in the case at bar the recognition of a common boundary for a long period of time is evidence of agreement and acquiescence, which may well exist without the necessity of a prior dispute. See 8 Am. Juris. 804. As stated in the annotation in 69 A.L.R. 1491: '. . . where the owners of adjoining land occupy their respective premises up to a certain line, which they mutually recognize and acquiesce in as the boundary line for a long period of time, . . . they and their grantees are precluded from claiming that the boundary line thus recognized and acquiesced in is not the true one, although such line may not be in fact the true line according to the calls of their deeds.' "

■ The proof in this case established that the parties and their grantees acquiesced in the boundary set out by iron pins for longer than seven (7) years. Accordingly, we reverse the chancellor and remand this case for entry of a decree consistent with this opinion. That decree must locate the boundary by description. In *Rice v. Whiting,* 248 Ark. 592, 452 S.W.2d 842 (1970), we explained that where a boundary line is involved, the decree, the permanent record, should describe the line with sufficient specificity that it may be identified solely by reference to the order and without reference to a plat which may not be in existence in a few years.

■ As stated at the beginning of this opinion, we are setting aside a finding of fact by the chancellor. We only do so when such a finding is clearly erroneous. ARCP Rule 52 (a); *Kinghorn v. Hughes,* 297 Ark. 364, 761 S.W.2d 930 (1988). The chancellor in

this case based his ruling on the specific finding that:

> Defendants have not proven that when plaintiffs acquired the property from the Strattons that the grantors and grantee intended that the boundary lines of the property be fixed by the iron pins.

Because we give such deference to a Chancellor's finding of fact, we set out some of the testimony that causes us to reverse the finding. Gary Stratton, the grantor who divided the eleven (11) acres testified:

> Q: Okay. Now, if you would, tell the Court if you had the occasion to meet with the Robertsons or either of them on the property to discuss the terms of the sale?
>
> A: Yes, we did.
>
> Q: More than once?
>
> A: Pardon?
>
> Q: More than once?
>
> A: I recall one time—yes, more than once.
>
> Q: And I suppose at that time you had not already decided exactly where the three (3) acres would be. Is that right?
>
> A: Not exactly, no, sir.
>
> Q: And during the course of your negotiations did you determine where you wanted the corners of that property to be located?
>
> A: Yes. Mr. Robertson and myself discussed it.
>
> Q: And as a result of those discussions, did you actually decide where the corners were to be located?
>
> A: Yes.
>
> . . .
>
> Q: So the pin was to be set to the west so that he would retain the oak tree?
>
> A: That's correct.

Q: Then you walked back to where?

A: Well, to this pin here (indicating on survey).

Q: Okay, and then from there where?

A: Then marked this—this pin here (indicating on survey).

Q: Okay. And there were pins placed, as I understand it, on all these various corners?

A: Yes.

. . .

Q: Let me repeat the question then. Were your instructions to Mr. Methuin [first surveyor] with regard to this survey either to locate exactly where the stakes and pins were in the ground and create a description from those pins, or was he to survey to determine where the pins should go?

A: No. I directed the surveyor to the pins myself and I asked him to survey the property according to those pins.

. . .

Q: Okay. Do you recall whether or not, when the property was surveyed in 1977, whether a boundary line was flagged and a path was cleared, consistent with what Mrs. Robertson recalled?

A: When the surveyors surveyed it, they flagged the line, yes?

Q: Okay.

A: And had to cut the brush out to make the survey, yes, part of it.

Q: And at the end of this flagged and cleared path, was an iron pin located, to the best of your knowledge? Is there an iron pin at the end of the . . .

A: Yes.

. . .

Q: Now, Mr. Stratton, now that you were neighbors, I guess one of the good things that came out of that was that you didn't have quite as much to mow, but if you would, would you tell the Court, what were the practices of you and what were the practices that you observed Mr. Robertson with regard to mowing down that imaginary line between those two pins?

A: I took care of what was mine and he took care of what was his.

Q: And was it basically a line that was between the two pins that chain link fence sat onto, as well?

A: Yes.

Q: And this continued to be the conduct of both the Robertsons and your family from 1977 until 1983 when you sold it?

A: Yes, sir.

(Tr. p. 111-117)

Kenneth Robertson, a plaintiff and an appellee, and a grantee of the three-acre tract who is now claiming the erroneous description controls, testified:

Q: Okay. Now, Mr. Robertson, were you aware at the time that you purchased the property in 1977 that there were iron pins placed at various corners to your three (3) acres?

A: I was, yes, sir.

Q: Can you tell the Court whether any corner, to the best of your knowledge, did not have an iron pin?

A: At the time, they all—they was all there.

. . .

Q: Okay. Tell the Court what you and Mr. Stratton did. Now, this was before you acquired the land?

A: Okay, he walked me to each corner, pointed it out to me, where the boundary lines was . . .

Q: Mr. Stratton took you to this point, this point, (indicating on survey)?

A: Yeah.

Q: And were there points up here, too? Up in the front?

A: Yes, sir.

Q: And so you just . . .

A: Well, yeah, they was . . .

Q: So either you or Mr. Stratton, or both of you, at some point had to decide where those corners were?

A: Yeah, he—we went to each corner.

Q: Okay.

A: I don't remember going right to the one on the front on the right, but to the west, and south, and the east, we went to them.

Q: And you went to those corners, and—was this before you bought the land? Or after?

A: It was while I was in the process of buying it.

Q: Okay.

A: I don't remember . . .

Q: So, it was probably after you'd showed some initial interest, but before you actually closed the deal?

A: Yeah, probably. Yes, sir.

Q: And at that time Mr. Stratton had put those pins in and the two of you walked to them and made sure you knew where they were, and those pins—what was the purpose of those pins as you understood it?

A: Supposed to have been the boundary lines.

. . .

Q: Okay. Now you know, I want to ask you something, Mr. Robertson. I mean, what I hear you saying is that if the legal description in your deed gives you a little more land,

then what Mr. Ball [surveyor] says, is what you want. Is that right?

A: Well, what Mr. Ball—according to Mr. Ball here, this is what I should have.

Q: Okay. And even though it goes beyond the pins, that's what you should have because that's what it says in the deed?

A: I should have on—what my deed says is what I want, and Mr. Ball has got it marked here right, and that's what I want and that's all, that's it.

(Tr. p. 89-92.)

Virginia Robertson, the other grantee of the three-acre tract, and a plaintiff below, testified:

Q: Okay, And do I understand your testimony correctly that the boundaries of this three (3) acres when you purchased it in 1977 were set by the placing of various iron pins between the various lines?

A: Yes.

(Tr. p. 101.)

Sandra Harris, one of the subsequent grantees of the eight-acre tract and a defendant below, testified:

A: We walked with Gary Stratton over the entire property — well, he showed us the pins that were placed, and then we walked the entire property ourselves.

Q: Okay. And did you find pins at all the corners?

A: Yes.

Q: And what, if any, understanding did you have as to how those pins set relative to the boundaries of the property?

A: It was my understanding that that was the property we were buying.

(Tr. p. 128.)

Samuel Ball, the surveyor who used the computer plotter,

found the iron pins still in place in 1988. He testified:

A:  The corners that I had were corners that were in place.

Q:  All right, they were already in place?

A:  Yes, sir.

Q:  The corners that you had and that you looked at at that time?

A:  Yes, sir.

Q:  And would you describe how those corners were in place?

A:  They were iron pipes that were driven into the ground.

. . .

Q:  All right. Now, let me ask you a few questions, then. Your survey, which has been introduced as Plaintiffs' Exhibit Number 3, reflects that you did find fencing on certain of the boundaries, found iron pins, I believe, at all corners.

A:  Yes, sir.

Q:  Is that correct?

A:  Yes, sir.

Q:  And the fact that you found iron pins at all the corners is reflected on your survey by the FIP?

A:  It is.

(Tr. p. 60-67.)

Finally, there was no testimony from either of the parties that he or she had ever occupied any land over or across his or her boundary as established by the iron pins. In fact, on those the parts of the property which were mowed, each mowed up to the line established by the iron pins. The rest of the property was in the woods. Accordingly, we set aside the chancellor's finding of fact and reverse and remand for entry of a decree consistent with this opinion.

Reversed and remanded.