Frank MYERS *v.* David YINGLING
and Venice Yingling

07-790                                                                279 S.W.3d 83

Supreme Court of Arkansas
Opinion delivered March 6, 2008

[Rehearing denied April 10, 2008.]

*Robert Hudgins*, for appellant.

*Murphy, Thompson, Arnold, Skinner & Castleberry*, by: *Blair Arnold* and *Casey Castleberry*, for appellees.

TOM GLAZE, Justice. We first considered this case last year in order to decide a jurisdictional issue. *See Myers v. Yingling*, 369 Ark. 87, 251 S.W.3d 287 (2007) (*Myers I*). Pursuant to Ark. Sup. Ct. R. 1-2(a)(7), the case is now back before us for a consideration of the merits of the appeal.

On May 6, 2004, appellees David and Venice Yingling filed suit against appellant Frank Myers, alleging that Myers had blocked the only means of egress onto the Yinglings' property. The Yinglings alleged that their property was separated from Myers's property by a roadway, "Yingling Lane," and that "Overstreet Lane" was a privately maintained roadway used by the Yinglings for access to their land. They contended that Myers had erected a gate across Overstreet Lane, denying them access to their property. The Yinglings sought a declaration that Overstreet Lane was a private roadway over which they had acquired a prescriptive easement. In an amended complaint, the Yinglings also averred that they had acquired title to the property by adverse possession.

The White County Circuit Court entered an order on October 10, 2005, finding that there was insufficient proof of adverse possession and that the issue was whether there had been acquiescence by the parties and their predecessors in title. After discussing the evidence, the court concluded that, through the years, the parties and their predecessors in title had agreed that a fence along the west side of Overstreet Lane was the boundary line of the property; thus, even though the survey showed the actual property line to exist east of the road at issue, acquiescence had overcome the survey. However, the court noted that the Yinglings had not provided a legal description of the property and gave them forty-five days to provide the court with that description.

Myers filed a notice of appeal from the trial court's October 10 order on November 7, 2005, and he lodged the record with this

court on February 2, 2006. On February 16, 2006, the trial court entered a second order in which it reiterated its conclusion that the Yinglings had acquired title to the property by acquiescence; however, this order also incorporated the legal description of the property. Myers filed a second notice of appeal from this order on March 6, 2006. This court dismissed Myers's appeal without prejudice, holding that, once Myers filed his notice of appeal and lodged the record with this court, the circuit court lost jurisdiction to act further in the matter, and the court's February 16, 2006, order was void. *See Myers I,* 369 Ark. at 89-90, 251 S.W.3d at 290.

Following *Myers I,* the circuit court held a hearing on May 15, 2007. At that time, the trial court entered an order in which it again found that there was insufficient proof of adverse possession, but that there had been sufficient proof to establish that "the neighbors and predecessors in title of the parties used and agreed" upon a boundary line, such that the boundary line had been established by acquiescence. Accordingly, the court concluded that the Yinglings were the rightful owners of the property described in the order. Myers filed a timely notice of appeal the next day.

We first address a procedural argument, which Myers lists as his second point on appeal. As mentioned above, in the trial court's October 10, 2005, order, the court pointed out that the Yinglings had not introduced a description of the area being claimed and gave them forty-five days in which to submit a description. Despite the trial court's granting of time to submit the legal description, Myers filed his notice of appeal from that order. Myers's first appeal of this case was dismissed because the October 10, 2005, order, lacking a legal description of the property, was not a final, appealable order. *See Myers I,* 369 Ark. at 89, 251 S.W.3d at 289 (citing *Riddick v. Streett,* 313 Ark. 706, 858 S.W.2d 62 (1993)). In *Myers I,* this court stated that it was apparent that the circuit court "contemplated further action" in its October 10 order, but Myers's actions in filing his notice of appeal and lodging the record deprived the circuit court of jurisdiction to act further in the matter. *Id.* at 89-90, 251 S.W.3d at 290. We then determined that the trial court's February 16, 2006 order (which incorporated the legal property description) was void, and Myers's appeal from that order would also have to be dismissed. *Id.* at 90, 251 S.W.3d at 290.

After we dismissed the appeal, the parties again appeared before the circuit court, which held a hearing on May 15, 2007. At

that hearing, the Yinglings introduced a survey and legal description of the property through George Hamman, a surveyor. In this appeal, Myers argues that the trial court should not have allowed the Yinglings to introduce the survey after they had already rested their case. We reject Myers's argument.

At the time Myers filed his first notice of appeal, he knew that the trial court had specifically directed the Yinglings to submit a legal description of the property within forty-five days. By filing his notice of appeal and lodging the record, Myers himself truncated the proceedings in the lower court. Regardless of whether it was a mistake on counsel's part or a calculated move intended to deprive the circuit court of jurisdiction, it was nonetheless his decision to take an appeal from a nonappealable order. Myers should not now be heard to complain of error on the trial court's part and benefit from his own improper or untimely conduct.

This court has previously made it clear that, in boundary-line disputes, a legal description is necessary before any order rendered by the trial court is final and appealable. In *Petrus v. Nature Conservancy*, 330 Ark. 722, 957 S.W.2d 688 (1997), this court dismissed an appeal from an order finding that the Nature Conservancy had acquired title to a parcel of land by adverse possession. The trial court's order in that case was captioned "Final Order" and purported to quiet title in the Nature Conservancy, but it lacked a legal description of the property. This court held that the permanent record in a boundary-line decision should describe the line with sufficient specificity that it may be identified solely by reference to the order. Otherwise, the court wrote, "leaving those lines to be established by a future survey may likely result in additional disputes, litigation, and appeals." *Petrus*, 330 Ark. at 726, 957 S.W.2d at 90 (noting that the requirement that a court order fix and describe the boundary lines in a dispute between landowners discourages piecemeal litigation).

Here, while it is true that the trial court's October 10, 2005 order did not contain a legal description, neither did it purport to be a final order for the parties to appeal, as it was simply captioned "Findings of Fact and Law." By directing the Yinglings to submit a legal description of the property within forty-five days, the trial court clearly contemplated further action; however, Myers thwarted any such action by filing his inappropriate notice of appeal. Accordingly, we reject his argument that the trial court erred in allowing the Yinglings to submit the legal description of the property at a later date.

We now turn to the argument that Myers raises as his first issue on appeal, wherein he argues that the trial court erred in finding that the Yinglings had proven acquiescence by a preponderance of the evidence. Because the location of a boundary is a disputed question of fact, this court will affirm unless the trial court's finding is against the preponderance of the evidence. *See Rabjohn v. Ashcraft*, 252 Ark. 565, 480 S.W.2d 138 (1972); *Kittler v. Phillips*, 246 Ark. 233, 437 S.W.2d 455 (1969); *Clark v. Casebier*, 92 Ark. App. 472, 215 S.W.3d 684 (2005).

Whenever adjoining landowners tacitly accept a fence line or other monument as the visible evidence of their dividing line and thus apparently consent to that line, it becomes the boundary by acquiescence. *Rabjohn*, 252 Ark. at 570, 480 S.W.2d at 141; *Palmer v. Nelson*, 235 Ark. 702, 361 S.W.2d 641 (1962); *Clark*, 92 Ark. App. at 476, 215 S.W.3d at 686. A boundary line by acquiescence is inferred from the landowners' conduct over many years so as to imply the existence of an agreement about the location of the boundary line, and in such circumstances, the adjoining owners and their grantees are precluded from claiming that the boundary so recognized and acquiesced in is not the true one, although it may not be. *Rabjohn*, 252 Ark. at 570-71, 480 S.W.2d at 141; *see also Clark*, 92 Ark. App. at 476, 215 S.W.3d at 686.

Moreover, a boundary line by acquiescence may exist without the necessity of a prior dispute. *Harris v. Robertson*, 306 Ark. 258, 813 S.W.2d 252 (1991); *Deidrich v. Simmons*, 75 Ark. 400, 87 S.W. 649 (1905); *Clark v. Casebier, supra*. Nor is there any requirement of adverse usage up to a boundary fence to establish a boundary by acquiescence. *Morton v. Hall*, 239 Ark. 1094, 396 S.W.2d 830 (1965); *Clark, supra*; *Walker v. Walker*, 8 Ark. App. 297, 651 S.W.2d 116 (1983).

The property in dispute in this case is in the Northwest Quarter of the Southeast Quarter of Section Five, Township Nine North, Range Six West in White County. Specifically, the question presented to the trial court was the placement or location of the western boundary of the Yinglings' property and the eastern boundary of Myers's property. In its findings of fact and conclusions of law, the trial court found that there was sufficient proof that the parties and their predecessors in title had acquiesced to the fence along the west side of Overstreet Lane as being the north-south boundary between the properties, even though a survey of the property showed the actual line to be east of Overstreet Lane.

The Yinglings purchased their land in 1997 from Mrs. O.L. Love. David Yingling testified at trial that his property ran from Paradise Road and Overstreet Lane; Paradise Road runs east to west, and Overstreet Lane runs north from Paradise Road with a fence along the west side of the road. When Yingling purchased the property, he did not have it surveyed, but "took it that since [Overstreet Lane] went straight north, that that was the property line." Yingling stated that he put a gate up at the end of Overstreet Lane, next to Paradise Road, in 1998 or 1999 after a couple of four-wheelers were stolen from his property; he said that he put a lock on the gate and gave several people, including Myers, a key. However, he later changed the lock and refused to give Myers a key, at which time Myers tore the gate down and erected his own.

Yingling also noted that his property to the north abutted land belonging to William "Billy Don" Martin,[1] and there was a fence that ran north to south all the way up between the Yingling property and the Martin property. He described the fence along Martin's property to the north of Myers's property as running "all the way [to] Paradise Road," saying it was "straight and went all the way through there." Yingling also said that he was not sure whether there was a fence along the east side of the road when he moved in, although, on cross-examination, he could not deny that there was probably a fence on the east side when he bought the property.

The Yinglings' next witness at trial was Eddie Smith, who sold Myers his forty acres in 1986. Smith had purchased the property from Myers's grandmother in 1969 and, in the following years, ran cattle on both his forty and on the 320 acres to the east that he leased from Mrs. O.L. Love; these 320 acres would subsequently become the Yinglings'. Smith testified that he was familiar with Overstreet Lane and the fence that ran down the west side of the road, stating that he "considered that fence my line." He said that when he owned the land, the Overstreets owned a mobile home on the 320 acres, and that everyone who lived there had to maintain the road because it was "in pretty rough shape." Smith agreed that the "whole time [he] owned [the land, he] considered the fence to the west side of the road as the line."[2]

---

[1] Martin's property is directly north of Myers's land.

[2] Citing *Carney v. Barnes*, 235 Ark. 887, 363 S.W.2d 417 (1963), and *Warren v. Collier*, 262 Ark. 656, 559 S.W.2d 927 (1978), the dissent posits that there must be a mutual

On cross-examination, Smith stated that he "just considered where [the] fence was, well, that was my line," and he "considered the road was everybody's." When he owned the property, Smith said that he and the Martins, who lived on the property to the north, would maintain the road, which led at the time to Mrs. Love's property. Up until the Yinglings bought the property, everyone used the road, and no one had any problems with it. He noted that there was a fence on the east side of the road when he lived there, to keep his cattle from getting in the road, but he did not know whether the east fence was still there when the Yinglings bought the land. However, on redirect, Smith reiterated that he considered the fence on the west side of the road to be his boundary line the whole time he owned the property.

Although Myers testified that he and Mrs. Love, the Yinglings' predecessor in title, had never had any problems about where their respective boundaries were, the Yinglings also called Billy Don Martin to testify in rebuttal. Martin's family had owned the two forty-acre tracts that lay to the west of the northern end of the Yinglings' property; the eastern edge of the Martin property abutted the west side of the Yinglings' land, and the tract was due north of Myers's property. Martin stated that there was a fence along Overstreet Lane that ran all the way from the north side of his property south to Paradise Road. He described the fence as being "pretty well straight all up and down" the property.

Martin's grandfather had owned the property, and his great-grandfather "probably homesteaded all of this property" before that. Martin testified that it was his understanding that the fence had been built on what everyone thought was the property line. He further offered that, from the time he was a child growing up on the land, he thought that the property line was on the west side of the road and that the fence on the east side was just a pasture fence to keep livestock off of the road. Martin said that he thought

recognition of the fence as the dividing line between *adjoining landowners* and suggests that there was no evidence of any such mutual recognition in this case. The dissent also cites *Fish v. Bush*, 253 Ark. 27, 484 S.W.2d 525 (1972), for the proposition that acquiescence depends upon the intent of the adjoining landowners; the dissent contends that there was no evidence of any such intent. However, Smith testified that he leased what would become the Yinglings' property from Mrs. O.L. Love, and that he accessed the back forty by using the road between the properties. Because Smith considered the fence to be his property line, it is logical and reasonable for the trial court to have concluded that Mrs. Love, who was the adjoining landowner, would have considered it to be the line as well.

that "because it went straight up there to the backside of our property and to where Mr. Yingling lives now" and that he had "never heard anyone else, the Loves, the Overstreets, or anyone, comment about where the line was." In addition, Martin testified that it was his understanding that his father and grandfather had built the fence on what they understood to be the line between the Martin property and the Love property, which would later become the Yingling property. While there used to be a fence on the east side of the road, Martin said, it deteriorated over the years and became unusable, while the fence on the west side remained usable and serviceable.[3]

Despite this testimony, Myers contends on appeal that there is no evidence of acquiescence, and he argues that there was no evidence that the Yinglings or their predecessors ever possessed or occupied the land. However, cases from both our court and the court of appeals make it clear that it is the *acceptance of a fence line or other monument as the visible evidence of their dividing line* that creates a boundary by acquiescence; such a boundary may be inferred from the landowners' conduct over many years so as to imply the existence of an agreement about the location of the boundary line. *See, e.g., Clark v. Casebier*, 92 Ark. App. at 476, 215 S.W.3d at 686. Nothing in our cases on acquiescence requires possession or occupation of the property; indeed, this court has held that acquiescence may arise "without the necessity of adverse use to the line." *Rabjohn v. Ashcraft*, 252 Ark. at 570, 480 S.W.2d at 141; *Kittler v. Phillips, supra.*

Moreover, in *Rabjohn, supra*, the court noted that, when adjoining owners mutually recognize and acquiesce to the boundary, "they *and their grantees* are precluded from claiming that the boundary line thus recognized and acquiesced in is not the true one, although it may not be." *Rabjohn*, 252 Ark. at 570-71, 480 S.W.2d at 141 (emphasis added). Therefore, given Smith and Martin's testimonies that they had always presumed the western

---

[3] The dissent suggests that Martin's testimony did not reveal the existence of a prior dispute over where the fence lines were among neighbors. However, as mentioned above, our case law concerning acquiescence has been clear that a boundary line by acquiescence may well exist *without the necessity of a prior dispute. See, e.g., Harris v. Robertson*, 306 Ark. 258, 813 S.W.2d 252 (1991); *Gregory v. Jones*, 212 Ark. 443, 206 S.W.2d 18 (1947). Nor is there any requirement of adverse usage up to a boundary fence to establish a boundary by acquiescence. *See Kittler v. Phillips, supra; Morton v. Hall, supra*. Thus, that Martin did not testify about any prior dispute between neighbors over the location of the boundary is of no moment.

fence to be the boundary line of their land, there was ample evidence from which the trial court could conclude that the parties' predecessors in interest had acquiesced to the fence as the boundary line. Further, under our case law, as Smith's grantee, Myers is precluded from disputing the boundary line that was established by acquiescence.

The dissent states that it was the Yinglings' burden to prove that "the parties agreed on a boundary other than that described." However, our case law on acquiescence does not require that the acquiescence must have originated or arisen between the *current* landowners. Instead, our court has held that the determination of a boundary by acquiescence binds adjoining landowners *and their grantees. See, e.g., Rabjohn v. Ashcraft, supra.* Thus, when, as here, the determination of the boundary by acquiescence occurred before the current landowners came to occupy the property, the current owners are "precluded from claiming that the boundary thus recognized and acquiesced in is not the true one." *Rabjohn,* 252 Ark. at 271, 480 S.W.2d at 141.

Myers's final point on appeal is that the trial court should have granted his oral motion to amend his pleadings to incorporate a counterclaim for a prescriptive easement "to conform to the proof presented." Although pleadings are required so that each party will know the issues to be tried and be prepared to offer his proof, Ark. R. Civ. P. 15(b) allows for the amendment of the pleadings to conform to the evidence introduced at trial. *Hope v. Hope,* 333 Ark. 324, 969 S.W.2d 633 (1998). We will not reverse a trial court's decision regarding the amendment of pleadings to conform to the evidence in the absence of a manifest abuse of discretion. *Id.*

Here, there was no abuse of discretion in the trial court's refusal to allow Myers to amend his pleadings to include a counterclaim for a prescriptive easement, because the proof did not establish a prescriptive easement. This court has established the burden one faces when asserting his right to land by prescriptive easement:

> One asserting an easement by prescription must show by a preponderance of the evidence that one's use has been adverse to the true owner and under a claim of right for the statutory period. Some circumstance or act in addition to, or in connection with, the use which indicates that the use was not merely permissive is

required to establish a right by prescription. Overt activity on the part of the user is necessary to make it clear to the owner of the property that an adverse use and claim are being exerted. Mere permissive use of an easement cannot ripen into an adverse claim without clear action placing the owner on notice.

*Bobo v. Jones*, 364 Ark. 564, 222 S.W.3d 197 (2006); *Manitowoc Remanufacturing, Inc. v. Vocque*, 307 Ark. 271, 819 S.W.2d 275 (1991). This court has said that the statutory period of seven years for adverse possession applies to prescriptive easements. *Bobo v. Jones, supra; Duty v. Vinson*, 228 Ark. 617, 309 S.W.2d 318 (1958); *see also* Ark. Code Ann. § 18-61-101 (Repl. 2003).

Here, there was no proof that would have supported a prescriptive easement. The Yinglings had not been on the property for seven years at the time they filed their suit; in addition, there was no proof presented that either side's use of the road was adverse for the entire period of time. Indeed, at the outset, after the Yinglings put up their first gate in 1998 or 1999, they gave Myers a key to the gate after he asked for one. Thus, there is no evidence of overt, adverse use for the statutory period, and it was therefore not an abuse of discretion for the trial court to refuse to allow Myers to amend his pleadings to add a counterclaim for a prescriptive easement.

Affirmed.

HANNAH, C.J., GUNTER, and DANIELSON, JJ., dissent.

PAUL E. DANIELSON, Justice, dissenting. Because I disagree that there was ample evidence from which the circuit court could conclude that the parties' predecessors in interest had acquiesced to the fence as the boundary line between the two properties, I respectfully dissent.

As the majority correctly stated, whenever adjoining land-owners tacitly accept a fence line as the visible evidence of *their dividing line* and thus apparently consent to that line, it becomes the boundary by acquiescence. *See Rabjohn v. Ashcraft*, 252 Ark. 565, 480 S.W.2d 138 (1972) (emphasis added). However, the mere existence of a fence between adjoining landowners is not alone sufficient to establish a boundary by acquiescence; there must be a mutual recognition of the fence as the dividing line. *See Carney v. Barnes*, 235 Ark. 887, 363 S.W.2d 417 (1963); *Warren v. Collier*, 262 Ark. 656, 559 S.W.2d 927 (1978). The party which contended

that the boundary is other than that described in the deed, here, the Yinglings, had the burden to prove that the parties agreed on a boundary other than that described. *See Council v. Clark*, 246 Ark. 1110, 441 S.W.2d 472 (1969).

First and foremost, the Yinglings failed to establish a mutual recognition between adjoining landowners that the fence on the west side of Overstreet Lane was considered to be the boundary line between their adjoining lands. While the majority relies heavily on the testimony of Eddie Smith, Smith's belief that his east boundary line was to the west of Overstreet Lane does not establish that he also considered it to be the western boundary line of the Yinglings' property. Smith clearly believed the road was for public use, not that the fence to the west of Overstreet Lane created the division line between his property and the Yinglings' property. In fact, Smith's testimony illustrates his belief that everyone owned the road. Smith did not believe that he was an adjoining landowner with Yingling; rather, Smith mistakenly believed the road divided their two properties. It is my opinion, when considering the totality of Smith's testimony, it does not support a finding of a boundary by acquiescence.

The majority further relied on the testimony of Billy Don Martin. Martin possesses property directly north of Myers's property and testified at trial that he personally believed the east boundary line to Myers's property was the fence west of Overstreet Lane. However, he also repeatedly mentioned that there were two fence lines — one fence to the east of Overstreet Lane and once fence to the west. Finally, based on Martin's testimony, there was never a prior dispute over where the fence lines were among neighbors and he never heard anyone comment about where the boundary lines were located.

In *Ball v. Messmore*, 226 Ark. 256, 289 S.W.2d 183 (1956), the appellants, in claiming more land than the chancellor awarded them, relied upon the testimony of several witnesses who said that a branch had long been understood to be the line. This court held that while that testimony may have been true, it fell short of establishing a record title, adverse possession, an agreed boundary line, or any other fact of substantive importance. *See id.* We held that it, at most, showed the existence of a general belief about the line, but further provided that such a belief could not have the effect of vesting or divesting the title to real property. *See id.*

In the instant case, Martin's personal opinion also only shows, at most, the existence of a neighbor's general belief about

where the boundary line might be. Furthermore, the rule of acquiescence is based on the intent and agreement between *the adjoining landowners. See Fish v. Bush*, 253 Ark. 27, 484 S.W.2d 525 (1972) (holding the basic question of acquiescence is one of intention, namely, whether adjoining landowners meant to recognize a fence as a boundary).

The majority correctly stated that boundary by acquiescence has usually been inferred from the landowners' conduct over so many years as to imply the existence of an agreement about the line. *See Warren v. Collier*, 262 Ark. 656, 559 S.W.2d 927 (1978). Here, Mr. Myers's conduct did not suggest acquiescence. When the Yinglings first put a gate on Overstreet Lane, admittedly, Myers did not object, but asked for a key. However, Myers immediately changed the gate once he realized that the Yinglings were claiming possession to Overstreet Lane, to which Myers had legal title. Again, the Yinglings, the party which argued that the boundary is other than that described in the deed, had the burden to prove that the parties agreed on a boundary other than that described. *See Council v. Clark, supra*. Based on the failure of the Yinglings to meet that burden of proof, the boundary line is that described by the deed.

In conclusion, I find it interesting that even the majority recognizes that the Yinglings did not have the property surveyed when they purchased it, but speculated as to the property line. It is important to note that not every fence erected is for the purpose of creating legal boundaries. Often cross-fences are confused for boundary lines and future property owners are not always privy to the original purpose for fencing. Here, the overwhelming weight of the evidence does not support a boundary by acquiescence, especially considering that the testimony supports there had never been a prior concern by any of the neighbors as to where the property lines were located, everyone used and maintained Overstreet Lane, and Smith did not believe his fence to the west of Overstreet Lane created the division line between his property and the Yinglings' property.

The circuit court's finding was against the preponderance of the evidence. For the foregoing reasons, I respectfully dissent.

HANNAH, C.J., and GUNTER, J., join.