Cite as 2024 Ark. App. 541

# ARKANSAS COURT OF APPEALS
## DIVISION II
### No. CV-23-396

| | | |
|---|---|---|
| JUDY KASTL | | Opinion Delivered November 6, 2024 |
| | APPELLANT | |
| | | APPEAL FROM THE SCOTT COUNTY CIRCUIT COURT [NO. 64CV-21-106] |
| V. | | |
| BETTY PEREZ | | HONORABLE TERRY SULLIVAN, |
| | APPELLEE | JUDGE |
| | | AFFIRMED |

**ROBERT J. GLADWIN, Judge**

Appellant Judy Kastl files this one-brief appeal from an order entered on December 6, 2022, denying her quiet-title action and granting appellee Betty Perez's counterclaim of trespass. Judy argues that we should reverse the order and remand for an award in her favor as owner of the disputed real property on the basis of boundary by acquiescence or, alternatively, adverse possession. Additionally, she argues that we should reverse the portion of the order awarding damages to Betty in her counterclaim. We disagree and affirm.

## I. *Facts and Procedural History*

In 2003, Judy entered into an owner-finance agreement (the "Contract") for the purchase of certain real property located in Scott County and described therein as 371 Redbud Street, Waldron, Arkansas. In 2015, Judy received a quitclaim deed—describing the

parcel by the common address and by legal description—from one of the grantors under the Contract.

Betty purchased the adjoining property in 2019, and after completing renovations to the house and land that had been vacant for ten years, she moved in during the summer of 2020. The dispute concerning the real property at issue in this appeal commenced approximately five years after Judy received the quitclaim deed for her property and less than two years after Betty received a warranty deed for her property. The disputed tract is on the south border of Betty's parcel and the north border of Judy's.

Beginning on or about September 2020, the parties began to dispute where the boundary between their respective properties was located. On or about June 15, 2021, after hiring Don Bland Surveying, Inc., to conduct a survey of her real property, Betty received a survey that indicated that the old fence line that Judy and her predecessors in title had believed denoted the boundary line of Judy's property was incorrect. On or about June 30, Betty's agent informed Judy of the survey results and stated that Betty intended to establish her property rights by erecting a fence. On or about July 3, Judy wrote to Betty's agent stating that she objected to any fence or other additions to the disputed property "until it is legally established where the property line runs" and until she hired a surveyor to survey her property.

Despite Judy's objections, on July 10, Betty erected a fence using panels and T-posts in accordance with the boundary line determined by the survey. Less than two weeks later, on or about July 20, Betty began to remove the old fence, and Judy and other individuals

2

took down the new fence that Betty had recently erected and left the T-posts and panels on Betty's property.

On August 2, 2021, Judy filed a complaint to confirm and quiet title, which was followed on September 6, 2022, by an amended complaint sounding in adverse possession and boundary by acquiescence (together, the "Complaint"). In her Complaint, Betty described the disputed real property (the "Disputed Tract") as follows:

> A part of the SE 1/4 of the SE 1/4 of Sec. 21, T-3-N, R-29-W in Scott County, Arkansas more particularly described as commencing at the intersection of the South right of way of Waldron – Danville Road and the East right of way of Red Bud Street in the City of Waldron; thence S 01°14'49"W, along the East right of way of Red Bud Street, a distance of 388.73 feet to the POINT OF BEGINNING; thence S 89°22'53"E, a distance of 212.86 feet; thence S 10°09'43"W, a distance of 24.99 feet; thence N 88°43'50"W, a distance of 208.97 feet to the East right of way of Red Bud Street; thence N 01°14'49"E, a distance of 22.27 feet to the POINT OF BEGINNING; said described tract containing 0.11 acres, more or less.

On October 25, 2022, Betty filed a counterclaim to Judy's Complaint, asserting "trespass of chattels" and seeking money damages for the new fence she had installed, which she alleged that Judy and her agents had torn down. Betty claimed that due to Judy's action in tearing down the new fence and taking the materials, she should be awarded damages for the cost of the materials in the amounts of $378 for the T-posts and $270 for the panels or, alternatively, in an amount to be proved at trial. In her October 31 response to Betty's counterclaim, Judy denied both the claim that the survey accurately showed the correct boundary line between the property and the allegations that she destroyed the fence and stole the materials.

3

The circuit court held a bench trial on the contested matter on November 22, 2022. Both Judy and Betty testified and called witnesses in support of their claims.

Judy testified that she acted under the belief from her grantors that a fence located in the tree line constituted the property line at the edge of her property and that it had been considered as such by her predecessors in title for fifty years. Judy stated that she also had treated the fence as the boundary line from 2003[1] through 2020, and her renters had mowed, removed debris, and maintained the real property beginning at the fence line and south to the remainder of her real property during that time. Judy acknowledged that she took part in tearing down the T-posts and panels but denied taking them. She did not testify regarding any resulting damages to the property.

Richard McFarland, who owns property just to the northwest of Judy's property, testified that previous owners treated the boundary line to Judy's property in the same manner as Judy and her tenants; and he said there is a fence and tree line, which had been present since he moved there in 1989. He added that he noticed several people taking down a cattle panel fence and laying it there but stated that no one took the materials. He explained that the materials had been lying there a "long time." McFarland said he believes either Judy's tenants or grandchildren disassembled the fence. He stated that eventually Betty pulled them to the back of her property with a riding lawnmower and put them up there.

---

[1]Judy originally obtained her interest in her property beginning in 2003 through the Contract. During this time, her tenants mowed and maintained the property. The Contract required the property to be mowed until the purchase price had been paid, at which time the quitclaim deed was exchanged.

Tanya Medina, who lives directly across the street from Judy's property, testified there is a tree line and a partial fence that have been there since she moved there in 1997. She said that she knew the previous owners and that they, too, treated the tree line and partial fence as the boundary line of Judy's property and took care of the property up to the fence. Tanya described that she took care of the property for the previous owner from 1997 to 2001 and mowed up to the fence line. She noted that Judy had always taken care of the property on her side by having her renters mow it, and it had "always been the separation." She stated that there has never been a dispute about the boundary until now. She testified that the old fence line is visible, but that Betty tried to take it down. She also acknowledged that she saw Judy taking down the new fence Betty had installed and that she initially just laid it down but later put it on the tree line.

Kevin Isom testified that his mother, Sherrie Armstrong, had been friends with and worked for Judy for years. She had been the tenant for thirteen or fourteen years and had recently passed away. He explained that at the time of the hearing, he had been Judy's tenant for almost a year. Isom testified that the property line is where the tree line is between the properties and that the fence was in place before his mother moved there. He testified that he and his mother maintained the property during the time they each had lived there—including mowing, weed eating, and cutting vines off the trees—up to the tree line. He confirmed that he was present when Judy took down the new fence Betty had erected and that Judy simply laid the pieces down next to the tree line and that Betty subsequently took them to the back of her property.

Betty called Connie Sanford, who testified that she had lived down the street for fifteen years. She stated that she had known Judy's former tenant, Sherrie Armstrong, and that no one had maintained the Disputed Tract until the previous year. She explained that she had never seen a fence on the tree line; rather, it is only a piece of barbed wire that does not cover the entire tree line. She testified that she never thought the tree line was the boundary line.

Betty testified she bought her property in March 2019 but did not occupy it until July 2020. She explained that according to the local water department, the property had been vacant for ten years, and she purchased it from a real estate firm in Georgia that had bought it from a bank. Betty testified that she had hired Sherrie Armstrong and her nephew to help her clean up the property. Betty explained that one day Armstrong came out with a can of purple spray paint and painted a mark on the grass on the north side of the tree line all the way to the ditch and announced that it was her property line. After admonishing Armstrong, Betty contacted Judy about the issue, and Judy told her that Armstrong had the power to "do everything with that place" and that Betty would have to "go with them." Betty testified that this is what prompted her to have the property surveyed and that no previous survey could be located. Betty introduced photographs of the property and explained that the fence does not cover the entire tree line. She stated that from the time she purchased the property and moved in, the property in question was overgrown with trees and brush until she expressed interest in putting up a fence, at which point, it was cleared. Betty said she began putting a fence one foot inside her boundary and paid $437.54 for the panels and $336.234

6

for the posts, but after putting it up, someone took it down. She said the posts were gone and the panels were bent so badly that she had to use a garden tractor to pull them out. She never saw anyone take the materials, but the forty-five T-posts she installed were all cut down and removed, and she recovered only four of the panels. Betty testified that Isom had thrown pieces of the fence all over her yard, flipped her off, and cursed at her, calling her all kinds of dirty names. She reported the incident to the police and noted that they had come out to the property a total of five times.

Betty reiterated that she never thought the tree line was the boundary line and that it was not maintained and very overgrown on both sides of the tree line when she purchased and moved to the property. She specifically stated that she never acquiesced to such a boundary and even suggested that both Judy and she get independent surveys.

In closing, Judy's counsel argued that there had been recognition of the alleged boundary line by multiple witnesses, including Judy, and that it had been treated as such for many years. Counsel argued that boundary by acquiescence does not require express communication between the parties—that tacit acceptance or silence can be sufficient for boundary by acquiescence—and urged that Judy had met all the elements to establish her claim. In the alternative, counsel argued that if the circuit court was not satisfied with that claim, Judy claimed ownership of the Disputed Tract through adverse possession.

When the circuit court raised the question regarding proof of color of title and payment of ad valorem taxes, Judy's counsel responded that they had submitted the quitclaim deeds, which should be sufficient. The circuit court again asked about proof of payment of

ad valorem taxes, and counsel stated that he had evidence. At that time, the circuit court stopped him, noting that Judy had rested her case and that her claim for adverse possession had failed. Counsel responded that Judy had testified as to the payment of taxes but that they would just proceed with the boundary-by-acquiescence claim.

Betty's counsel then followed in closing, arguing that:

> The plaintiff does a good job on trying to argue that there's been a clear and visible boundary line, but this area is not taken care of. As you can see from the Google photo, it's been very grown up. You even heard from Mr. Isom that he says that he didn't actually mow up to the tree trunks, that he actually mowed to where the shrubbery is. Well, that area happens to be this area in dispute.
>
> You heard my client's witness, Connie Sanford's testimony that the area has not been taken care of in her 15 years of living there, and she was acquainted with Ms. Sherrie Armstrong. Nobody had lived on my client's property for the last 10 years. I feel like the failure to actually take care of this area gives my client weight and favor of declining the petition to quiet title.
>
> Moreover, you heard testimony from all of [Judy's] witnesses that they saw this fence get taken down. You heard testimony from my client that posts were taken from her, and she did not receive that back. I feel like that's a very good case for conversion, and we would request that my client be refunded the cost for the T-posts and the four panels that were taken from her.

The circuit court found in favor of Betty's counterclaim, stated that Judy or Judy's agents had destroyed the fence and T-posts, and entered judgment against Judy in the sum of $430.74, stating from the bench:

> The easiest thing is for a request for damages in this case.
>
> Ms. Perez erected a fence and T-posts. They were removed by the plaintiff or the plaintiff's agent.
>
> You don't have any right to destroy the property. If you remove it, it would be a simple matter here. Come and get it or it's here.

Ms. Perez, who I find to be credible, has testified she didn't ask for all of the panels. She missed four at a price of $26 apiece, that's $104. The T-posts, she said she didn't get any of them back. That's $326.74. She will have judgment in her counterclaim against Ms. Kastl for $430.74.

Regarding the plaintiff's claim, the adverse possession claim, you must have – in order to prove adverse possession, it's open, notorious, adverse, et cetera, all the elements, plus color of title. Which the color of title can be adjoining title because she does not—Ms. Kastl does not have legal title to the subject property, plus payment of ad valorem taxes. There was never anything introduced into evidence as to the payment of taxes. Consequently, the claim for adverse possession fails.

The only other way the plaintiff can prevail is for a boundary by acquiescence, which would show the tree line to be the boundary.

Ms. Kastl has rented this property. She hasn't been on the property. She has rented it, essentially, from the time she had ownership or when she was purchasing the property. But she was not on it herself.

There was testimony that her renters maintained up to the tree line. And there was testimony also from some of her witnesses that they observed her renters doing that. She never did it herself.

There's also opposing testimony from the defendant that, since she was there, she never saw anything until she began to erect the fence and there was a problem.

And I find the witness, Ms. Connie Sanford, to be credible. And the 15 years she was there, she didn't see it.

Before there to be a boundary line by acquiescence, both parties have to agree. I find the—in this case, the defendant has the legal title. She has a deed to this property. The plaintiff does not. And I find the property in question is owned by the defendant.

The plaintiff's claim is denied and dismissed. And the defendant will have judgment, which will draw interest at the legal rate per annum until paid, for $430.74.

The circuit court entered its order on December 6, 2022, summarily denying Judy's petition to quiet title and granting relief to Betty for the counterclaim with a declaration that

9

she is the owner of the real property in question and awarding damages to Betty in the amount of $430.74. Judy timely filed her notice of appeal on December 21.

II. *Standard of Review and Applicable Law*

We recently reiterated our standard of review in quiet-title and boundary-line actions as follows:

> We review quiet-title and boundary-line actions de novo. Because the location of a boundary is a disputed question of fact, we will affirm the trial court's finding unless it is clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. In reviewing a trial court's findings of fact, the appellate courts give due deference to the trial court's superior position and the weight to be accorded the testimony.

*William N. Gillison Revocable Tr. v. William W. Bunker and Claudia M. Bunker Joint Revocable Tr.*, 2024 Ark. App. 136, at 9, 685 S.W.3d 306, 311.

III. *Discussion*

This case began as one to quiet title, which is governed by Arkansas Code Annotated section 18-60-502 (Supp. 2023), and provides in pertinent part that

> (a) A claimant shall file in the office of the clerk of the circuit court of the county in which the land is situated a petition describing the land and stating facts which show a prima facie right and title to the land in himself or herself and that there is no adverse occupant thereof.

Section 18-60-502(b)(3) also notes that if "the petitioner has knowledge of any other person who has, or claims to have, interest in the lands, the petitioner shall so state, and the person or persons shall be summoned as defendants in the case." Judy argues on appeal that the

10

circuit court erred in finding that Judy was not the owner of the Disputed Tract because of (1) boundary by acquiescence and (2) adverse possession.

A. Boundary by Acquiescence

Judy submits that the record before us contains uncontradicted testimony that she and her predecessors in title treated a tree line in which there was a fence as the boundary line between two contiguous pieces of property, now owned by Judy and Betty.

Boundary by acquiescence may arise without the necessity of adverse use to the line. *William N. Gillison Revocable Tr.*, 2024 Ark. App. 136, at 10, 685 S.W.3d at 312 (quoting *Myers v. Yingling*, 372 Ark. 523, 530, 279 S.W.3d 83, 89 (2008)). A boundary by acquiescence arises from conduct of adjoining landowners over many years that implies an agreement to treat some visible marker as their boundary, wherever the true boundary might be. *Id.* A boundary by acquiescence is usually represented by a fence, a turnrow, a lane, a ditch, or some other monument tacitly accepted as visible evidence of a dividing line. *Id.* In such circumstances, the adjoining owners and their grantees are precluded from claiming that the boundary so recognized and acquiesced in is not the true one, although it may not be. *Id.*

To support her claim, Judy cites *Clark v. Casebier*, 92 Ark. App. 472, 215 S.W.3d 684 (2005), in which we noted the record showed no complaints about use of property until after a survey, as she maintains also occurred in this case. *Id.* at 476, 215 S.W.3d at 686. The irrigation ditch in *Clark* became the boundary by acquiescence:

> When the adjoining owners occupy their respective premises *up to the line they mutually recognize and acquiesce in as the boundary* for a long period of time, they and their grantees are precluded from claiming that the boundary thus recognized and

11

acquiesced in is not the true one, although it may not be. [*Walker v. Walker*, 8 Ark. App. 297, 299, 651 S.W.2d 116, 117 (1983)].

There is ample evidence to support the trial court's findings and conclusions in this case. Since the irrigation ditch was dug in the 1960s, the owners of the southern tract of land have used the disputed property and the irrigation ditch as their own.

*Id.* at 477, 215 S.W.3d at 687 (emphasis added).

Judy acknowledges that there must be acquiescence, and she claims the record demonstrates it in this case through testimony showing acceptance of the fence line by both Judy (since 2003) and her predecessors in interest. Judy submits that the words "up to the line they mutually recognize and acquiesce in as the boundary," cited in *Clark*, *supra*, say it all.

We disagree. Despite Judy's references to testimony that supports her claim for boundary by acquiescence, we hold that the record supports the circuit court's finding that Betty holds the deed and therefore legal title to the Disputed Tract. The circuit court noted that for "there to be a boundary line by acquiescence, both parties have to agree." When asked what acts or instances gave rise to the dispute over the location of the boundary line, Betty testified that shortly after moving onto her property, when she was beginning to clean up the tree row, Sherrie Armstrong came out with a can of purple spray paint and painted a mark on the grass all the way to the ditch and stated that was her property line. Betty explained that she became angry and told her not to ever put spray paint on her grass again. Betty testified that when she called Judy about it, she said that Sherrie and her son "had the

12

power to do everything with that place and [Betty] would have to go with them." Betty confirmed that these actions prompted her to obtain a survey to settle the issue.

The record includes testimony from Betty that she never thought the tree line was the boundary line between the properties and that it was not maintained and was very overgrown on both sides when she purchased and moved onto her property. Connie Sanford's testimony—that no one had maintained the Disputed Tract until after Betty moved in and that she had never considered the tree line to be the boundary line—clearly supported Betty's position. Moreover, upon learning that there was a disagreement about the accurate boundary line, Betty quickly took action to resolve it. Betty specifically testified that she never acquiesced to such a boundary and had even suggested that both Judy and she get independent surveys. Pursuant to our de novo review of the record and the analysis in *William N. Gillison Revocable Trust*, *supra*, we hold that the circuit court's finding on this issue was not clearly erroneous.

## B. Adverse Possession

As an alternative argument, Judy submits that she met the elements of the adverse-possession statute by introducing the quitclaim deed to her property and by testifying to the payment of ad valorem taxes.

Judy argues that the circuit court erred in disregarding her testimony that she had paid taxes when it ruled from the bench that because nothing was "introduced" regarding the payment of taxes, her adverse-possession claim "consequently" failed. She notes that the

resulting order that was entered denied her adverse-possession claim without further explanation.

To prove the common-law elements of adverse possession, a claimant must show that he has possessed the contested property continuously for seven years and that the possession has been actual, open, notorious, continuous, hostile, and exclusive, and it must be accompanied with an intent to hold against the true owner. *Stevens v. Hillenburg*, 2024 Ark. App. 295, at 7, 689 S.W.3d 695, 700. Arkansas Code Annotated section 18-11-106 (Repl. 2015) adds the requirement of proving payment of taxes on the property, and provides in relevant part:

> (a) To establish adverse possession of real property, the person and those under whom the person claims must have actual or constructive possession of the real property being claimed and have either:
>
> (1)(A) Held color of title to the real property for a period of at least seven (7) years and during that time paid ad valorem taxes on the real property.
>
> (B) For purposes of this subdivision (a)(1), color of title may be established by the person claiming adversely to the true owner by paying the ad valorem taxes for a period of at least seven (7) years for unimproved and unenclosed land or fifteen (15) years for wild and unimproved land, provided the true owner has not also paid the ad valorem taxes or made a bona fide good faith effort to pay the ad valorem taxes which were misapplied by the state and local taxing authority; or
>
> (2) Held color of title to real property contiguous to the real property being claimed by adverse possession for a period of at least seven (7) years and during that time paid ad valorem taxes on the contiguous real property to which the person has color of title.

Judy argues that there is no requirement that she introduce tax records because her proof through her testimony standing alone, as with any other element of proof, was

sufficient. Judy maintains that her testimony was uncontradicted as to payment of taxes on the contiguous property and cites *Boyd v. Roberts*, 98 Ark. App. 385, 255 S.W.3d 895 (2007), as an example of a case where tax-payment testimony was uncontradicted and resulted in a finding that this element was met. Judy maintains that her testimony met the statutory requirement of the payment of taxes for more than seven years and was sufficient to show ownership when coupled with her actual possession of the Disputed Tract and Betty's failure to present countervailing proof. Accordingly, she submits that the circuit court erred in disregarding the adverse-possession claim.

In order for a claimant to establish adverse possession under Arkansas Code Annotated section 18-11-106, the claimant must prove color of title *and* payment of ad valorem taxes, in addition to the common-law elements of adverse possession. *See, e.g.*, *Barnett v. Gomance*, 2010 Ark. App. 109, at 9, 377 S.W.3d 317, 323 (concluding that the circuit court did not clearly err in finding that the claimants were required to comply with the adverse-possession statute and that they failed to submit evidence showing the payment of ad valorem taxes).

We hold that Judy's claim is without merit. Judy introduced the Contract and the eventual quitclaim deed to her property located at 371 Redbud at the bench trial. When asked on cross-examination about her claim that she had been paying taxes on 150 feet and how she gained knowledge that she was paying 150 feet in taxes, Judy responded, "Well, my deed is registered down there and it's off of my deed." She also acknowledged that she had never obtained a survey of her property. And when the circuit court specifically asked Judy,

"And you realize, you don't have a deed to the disputed property? Do you understand that? . . . Do you understand what the deed shows?" Judy responded that she just knows what she was told when she bought her property. The only other information regarding Judy's alleged payment of ad valorem taxes was during closing arguments when Judy's counsel responded to the circuit court's question about proof of payment of ad valorem taxes, stating that he had evidence. The circuit court stopped him at that point, noting that Judy had rested her case—without introducing such evidence—and that her claim for adverse possession had failed.

The circuit court found that Judy failed to prove her adverse possession claim in part because she failed to provide evidence demonstrating that she paid the property taxes on the property. We conclude that the circuit court's ruling that Judy was required to comply with the statute and that she failed to submit evidence showing the payment of ad valorem taxes is not clearly erroneous. *Compare Boyd v. Roberts*, 98 Ark. App. at 289, 255 S.W.3d at 898 (accepting a party's contention of payment of ad valorem taxes where it was undisputed that the Robertses had color of title and paid taxes), *with Cleary v. Sledge Props., Inc.*, 2010 Ark. App. 755, at 8, 379 S.W.3d 680, 685 (holding that where the claimant had failed to submit the requisite proof of payment of taxes on the disputed property, his claim for adverse possession failed), *and Gibbs v. Stiles*, 2011 Ark. App. 302, at 7–8, 383 S.W.3d 453, 457 (holding that the claimants had not met the statutory requirements for tax payment where the records did not show that they paid taxes on the specific property in dispute).

Judy next asserts that that the circuit court erred in failing to find that she owned the property in question through adverse possession where Judy, her agents, and her tenants maintained the property as their own. Although we need not address this argument after affirming the circuit court's finding that Judy failed to prove the element of adverse possession requiring proof of payment of taxes, we summarily agree that Judy did not hold color of title because she does not have legal title to the Disputed Tract. *See, e.g.*, *Gibbs*, *supra*.

Judy relies on her own testimony that her tenants had been mowing the grass up to the fence for the past fourteen years and had treated the property as their own. She argues that there was no testimony otherwise as to any acts by Betty to the contrary and urges that the circuit court should have granted her claim to the property by adverse possession. She claims to have engaged in acts of notorious, open, and exclusive possession for more than seven years and that the actions of her tenants and herself over a period of time are presumed to be adverse. In support of her argument, Judy cites *Jackson v. Downs*, 2022 Ark. App. 17, at 6, 639 S.W.3d 416, 420 (noting there that action had been taken for *more than fifty years* and that one may be presumed to know of adverse use after such a lengthy passage of time).

Judy states that Betty's predecessors knew or should have known—at least since Judy purchased her property in 2003—that Judy was treating the land as her own to the fence line. Judy and her witnesses, Richard McFarland and Tanya Medina, testified that they had considered the boundary to be the fence in the tree line for more than seven years.

Although Judy argues that Betty presented no countervailing testimony, the record details Betty's testimony that when she bought the property in 2019, she did not consider

17

the fence-tree line the boundary and that the area in question was quite overgrown. And the circuit court specifically credited the testimony of Connie Sanford, the neighbor who testified that in the fifteen years she had lived there, the Disputed Tract had not been maintained. Similar to the issue of payment of taxes, we hold that the circuit court properly weighed the various evidence and testimony before it in making its finding that Judy failed to meet the statutory requirements to prove open, notorious, exclusive, and adverse use of the disputed property. We hold that the record supports that finding and that it did not clearly err in so finding.

## C. Betty's Counterclaim

Finally, Judy argues that the circuit court erred in finding for Betty on her counterclaim, concluding that Judy had destroyed property, stating in summary: "You do not have any right to destroy the property." Judy submits that there was no testimony that she destroyed anything.

Multiple witnesses testified that the new panel fence erected by Betty was taken down just a couple of weeks after it had been erected. Testimony from Richard McFarland stated that "several people"—maybe Judy's renters or grandchildren—took the fence down; Sherrie Armstrong testified that Judy took fence down, but Betty retrieved it; Betty testified that someone took the fence down.

Although Judy argues that no one testified that she destroyed any part of the fence, Betty testified that the posts were so badly bent that she had to utilize a garden tractor to remove them. And the record before us contains testimony from multiple witnesses,

18

including an acknowledgment from Judy herself, that she took down the sixteen-foot panels and T-posts that Betty had recently installed. Betty detailed the amounts she paid for the materials and gave specific calculations as to how many posts and panels were removed or damaged, and the circuit court—specifically finding her to be credible—based its award of damages on her testimony that she was missing four panels at a price of $26 apiece, $104 in total, plus the total cost of the T-posts in the amount of $326.74. We hold that the record supports those findings and that the total award of $430.74 was not clearly erroneous.

Affirmed.

HARRISON, C.J., and BROWN, J., agree

*Robert S. Tschiemer*, for appellant.

One brief only.