GERALD DISNEY ET UX *v.* CARL RAY KENDRICK ET UX

5-5323                                    458 S. W. 2d 731

Opinion delivered October 19, 1970

*Davis & Reed,* for appellants.

*James E. Evans,* for appellees.

CONLEY BYRD, Justice. This is a boundary dispute between appellants Gerald and Alta Disney and appellees Carl Ray Kendrick and Margie Kendrick, his wife. The only point for reversal is that the trial court erred in finding for the appellees on the issue of title.

At the close of the evidence the trial court made the following comprehensive remarks:

"This boils down to ownership of the triangular shaped piece of land on two bases: One by ad-

verse possession, and the other by agreed boundary or acquiescence. Mr. and Mrs. Disney purchased their lot in 1958; have occupied it since then. Mr. and Mrs. Kendrick bought their property immediately east of the Disney property in 1962, and have occupied it continuously since then.

"The pie-shaped strip of land has its point at the south or Old Wire Road side of the two respective properties, and then it fans out running north and its widest point on the north, according to the evidence, is about 30 feet. It is this 30 foot wide, pie-shaped piece, that is, 30 feet at its widest end, approximately, that is the subject of the controversary here.

"The evidence makes it clear that the legal description of the Disney property sustains the claim of title to this piece of land. The evidence makes it equally clear that this piece of land belongs to the Kendricks by acquiescence and agreed boundary. It is undisputed that a common originator of title, one Fink, owned all of the land which is now owned by the Kendricks and Disneys, respectively. He sold, by mesne conveyances, to somebody named Jaro who then sold to the Disneys. That left the Disneys owning their present property lying immediately west of the property then owned by Fink, which, later on some 3½ or 4 years later was sold to the Kendricks by this same Fink.

"The evidence, I think, is preponderantly to the effect that during all of the time that Mr. and Mrs. Disney owned the land and occupied it, and Mr. Fink owned and occupied his land, which he later sold to the Kendricks, there was no specific, visible, permanent monument or marker, fence, dividing line, call it what you will, that clearly and obviously and plainly marked the boundary line between the Disney and the Fink properties. But the evidence is equally clear that at some time or times

not specifically designated as to date, but in both instances before Fink sold to Kendricks, two concrete stobs, posts, chunks, however they may be referred to in the testimony, were installed at the southeast and northeast corners, respectively, of the Disney land. That Mr. Disney assisted in the installation of these concrete chunks, and at that time did so with the understanding and belief, which was shared by Mr. Fink, that these marked the two corners of the Disney land. That is, the southeast corner of the Disney land being identical with the southwest corner of the then Fink land, and the northeast corner of the Disney land being identical with the northwest corner of the Fink land.

"Sometime thereafter and the testimony is in dispute, that is to say, it is unclear, but sometime after these two concrete posts or stobs were sunk into the ground, Mr. Fink sold his remaining portion of what once was a large single tract to the Kendricks. From that time on, I think the evidence makes it preponderantly clear that there was no open, active dispute or disagreement between the Kendricks and the Disneys as to where the boundary line between the properties was, but makes it equally clear that, by apparent tacit agreement and by apparent common understanding, the line was that line between the two concrete chunks that had been put in by Fink and Mr. Disney, sometime before the Kendricks bought the property.

"Subsequent events and particularly, or at least initially, a survey that had to do with some adjoining lands to the north, and having to do with the outlining of the borders of an industrial park, caused both the Disneys and the Kendricks to wonder whether their lands, respectively, were really bounded the way they thought they were. And a still later survey, specifically, a survey that is in the evidence in this case, showed that the

boundary line was out of whack, it wasn't where it legally should have been, where the legal calls would put it to be. But notwithstanding that, from 1963 clear on up until sometime in 1968, with this knowledge and belief on the part of both the Disneys and the Kendricks that, somehow, their boundary line was awry, it was not where it really ought to be; but not knowing for sure just where it was, still, they continued to treat their respective properties as if the line was where they had formerly treated it to be. Beginning with the Disneys and the Finks, to start off with, and later the Disneys and the Kendricks, so that the two concrete markers apparently were the starting points and the base points for that north-south dividing line between the Disney and the Kendrick properties.

"The evidence shows this: That a partial fence, partial in the sense that it didn't run all the way from the north of the property down to the south on the Old Wire Road, but according to Mr. Carl Ray, about a third of the way from the north line down. This fence was almost exactly on the line between these two concrete stobs. It was there for approximately three years and then it was taken down along its north portion by Mr. Disney, and this apparently precipitated the unfortunate situation that resulted in the law suit. During all of this same time, the mowings of yards by the Kendricks and the Disneys approximated the imaginary line extending between the two concrete stobs.

"The testimony of Mr. McFerrin, who has lived across the street and a little dab east of the Kendricks and the Disneys since back in the forties, is that he clearly recalls a partial fence and it was on the same line as the line of mowing. He remembers, while Mr. Fink still had what is now the Kendrick property, the line of demarcation or separation between the two mowings of the

Fink unimproved lot on the east and the Disney improved, residential lot on the west, that is, the dividing line between the smooth, close-clipped mowing of the Disney yard and the rougher, longer, field cutting on the Fink land to the east. As he now recalls it over the period of several years, that line was about the same as the line between the two concrete stobs and the line where the partial fence line ran.

"All of these things simply go to complete the picture that, for whatever reason or combination of reasons, and wholly aside from what the actual line location was, Mr. and Mrs. Disney and Mr. Fink, initially, and thereafter the Disneys and the Kendricks, clear up until 1968, treated that line as if it were the sure-enough line. Now it is true that, beginning sometime in 1963, both the Kendricks and the Disneys had serious doubts about whether this was the line, actually. They speculated to themselves and each other that it may well be some other place over here; might even be where a corner of the Kendrick house would be cut off if the actual line were really fixed. Notwithstanding that they continued to treat it as if the theretofore established line continued to be the line. The only explanation, and it is not unreasonable at all, offered for this continued treating of the established line as *the* line, is the proposition advanced by Mr. and Mrs. Disney that, when this matter of the possibility of the line not being where they had thought it was came to their attention, it was then mutually agreed between them, in substance, 'Now you people go ahead and use this just like it was yours; it really isn't yours and it won't become yours, but as long as we live here and as long as you live there, why you can use it, just as if it were yours.'

"As I say, this is not at all unreasonable and it is an entirely neighborly thing. In any event, it

is the only evidence that serves to offset and to counteract all of the other evidence which tends to a contrary conclusion. It must be remembered that in these kinds of cases, where it is very difficult for memories to emerge with complete clarity and where motives and intentions are frequently clouded over, the decision must be guided by a preponderance of the conflicting evidence and a determination of what is the greater weight of the probabilities. On that basis I will resolve the. issue in favor of the plaintiffs and find that by a preponderance of the evidence there has been a boundary line established by acquiescence or as it is sometimes called, not entirely accurately, agreed boundary.

"Now, as a matter of law it is not required, in order to establish an agreed boundary line, that the people concerned be in an open dispute, although such frequently is the case. It is not necessary that a hostile feeling of people at dagger's point or fighting point exist, but there must be a genuine failure of knowledge as to where the line is, and there must be an uncertainty on the part of both parties concerned. In that sense, there is a dispute. One party says, 'well, now I believe very strongly that the line is here and this is where I think it is.' The other party says, 'Well, now I believe very strongly that the line is over here. And that is where I believe it truly is.' In that sense, there is a dispute as to the boundary, not a hostility, not an anger, not a personal falling out but a genuine uncertainty, a genuine dispute as to where the true line really is. This is the sort of hostility that the law means when it says that in order for the doctrine or theory of agreed boundary or boundary by acquiescence to operate so as to fix a legal boundary, there must be a hostility. It's the same kind of hostility that is spoken of in adverse possession. It doesn't mean that people are out fighting mad at each other and ready to do bat-

beliefs. And people may have that genuine conflict of honest and essential difference of opinion without being mad at each other and ready to do battle about it.

"In that sense, I think the evidence makes it quite clear that there was such a hostility in this case; there was such an uncertainty. There perhaps was not that uncertainty as far as the beliefs of the people were concerned, before the Kendricks entered the picture and indeed before the survey in 1963. Quite clearly both Mr. Fink and Mr. Disney believed that the two concrete markers marked the boundary line. Mr. Disney has so testified. After the Kendricks bought, by all of the testimony adduced here, the Disneys continued to believe that these marked the line. Mr. Kendrick has testified that Disney said to him: 'Here's these concrete markers here, and your land is inside these markers.' Kendrick evidently believed him. So, there was the common belief, a common understanding there, at least up until 1963 when the doubt arose. But even then for the next five years, up until sometime in 1968, the situation did not change; it continued just as it was. And I think under these facts that the doctrines of agreed boundary and boundary by acquiescence, either and both, does attach to this case, and is the governing principle.

"Now the doctrine of agreed boundary is simply this: Any deed, any piece of paper with a land description is easy to read, and anybody that has been through the 8th grade and learned to cipher a little bit can take a legal description and draw a picture on a piece of paper and say, 'Here's my 40 acres. And here's Joe's 40 acres; and here's Smith's 40 acres up here.' But it's a very different thing to take that description off the deed, or a picture on a piece of paper, and go out to the 40 acres on a rough mountain side, or in a chopped up area, and particularly in a heavily

residential area, and put that picture onto the ground, because the weather has a habit of changing things; and people have a habit of changing things. Where you have a street corner not paved, people cut and wear the corner away and you don't have a sharp clear corner, you've got a rounded corner. And if you have got a pop bottle cap showing the corner and the area gets paved over, then you have lost your pop bottle cap. So it's not always easy just to take a description and a picture and go out to the ground and say, 'Yep, here's the corner, here's that corner. Here's my land just like the deed says.'

"This is how these uncertainties arise. This is why the law says it is better to have controversy settled once and for all than to have it continually carry on from owner after owner after owner and always have the doubt as to where this line is. The law, therefore, recognizes that it is a good thing and a proper thing that people may agree where the boundary is and never mind that one of them may or may not be giving up some land that he may or may not be required to give up under different circumstances. The fact is that they have agreed either by their actions, or by their outright agreement, to settle the question of the boundary, although, as I say, 'never mind where it really is. It's too much trouble to find out about it. We have been getting along here for years. Let's just say this is it.' And if they say that by their actions or by their words or both, and the situation lasts for a measurable, substantial period of time, then, under the law, it becomes fixed and fast as the boundary line between these two particular pieces of property. This is the meaning of the theory and the basis of the doctrine of agreed boundary that we lawyers talk about. These fancy words simply mean that people owning adjoining lands, not being sure of where their line is, have a right to agree between themselves that this is the line.

That's all there is to the doctrine of agreed boundary.

"I think the evidence is this case preponderantly establishes that such is what happened in this instance. The decree of the Court is to grant the prayer of the complaint. You may prepare a decree. Costs taxed against the defendants."

As we view the record a preponderance of the evidence shows that appellees and their predecessor in title, Bill Fink, had been in possession of the area up to the disputed boundary line, under a claim of ownership, from sometime in 1958 until sometime in 1968 immediately prior to the filing of this suit. A preponderance of the evidence also shows that during that time appellants acquiesced in that possession. This we conclude is sufficient to support the trial court's decision. See *Harris* v. *E. B. Mooney, Inc.,* 211 Ark. 61, 199 S. W. 2d 319 (1947).

Affirmed.