DAVID M. GLOVER, Judge
Ginger Durham appeals the Chicot County Circuit Court's order quieting title to disputed property, specifically ownership of a boat dock, in appellees Al and Penny McCone. Ginger argues the circuit court erred in finding the McCones had proved a boundary by acquiescence. We affirm the circuit court's decision.
This case concerns the division of Lot 1 of Yellow Bayou Estates No. 2 in Chicot County, Arkansas. Glenn and Dee Atkins originally owned Lot 1; in May 1993, they sold the following part of Lot 1 to Joseph and Rowena James:
THE NORTH One-Half (1/2) of frontage of Lot One (1), Yellow Bayou Estates No. 2 as shown by Plat thereof found in Plat Book 2, Page 29, in the office of the Clerk and Ex-Officio Recorder for Chicot County, Arkansas, being the ½ of frontage nearest the bridge.
The Atkinses retained the remaining part of Lot 1, and both the Atkinses and Jameses built fishing cabins on their respective properties, jointly building a sewer-pump station to be maintained by both parties. In 1995, the Jameses sold their property to Jim and Tamera Gulledge by warranty deed that described the property sold as
The North One-half (N ½) (established by including one-half of road frontage) of Yellow Bayou Estates No. 2, as shown by the plat thereof prepared by G.E. Alexander, Jr., recorded January 4, 1991, at page 29 of Book 2 of the Plat Records of Chicot County, Arkansas.
In 2002, the Gulledges sold the property to Drew and May Plunkett; later in 2002, the Plunketts sold the property to Danny Joe and Ann Winchester. In 2008, the Winchesters sold the property to Scott and Ginger Durham. Pursuant to their 2013 divorce decree, Scott quitclaimed the property to Ginger.
The Atkinses retained their property until 2013, when they sold it to appellee Al McCone by warranty deed, which described the property as
THE SOUTH HALF (S ½) OF LOT ONE (1) OF YELLOW BAYOU ESTATES NO. 2 AS SHOWN BY PLAT THEREOF FOUND IN PLAT BOOK 2, PAGE 29 IN THE OFFICE OF THE CIRCUIT CLERK AND EX-OFFICIO
*909 RECORDER FOR CHICOT COUNTY, ARKANSAS.
SUBJECT TO ALL EASEMENTS, RIGHTS OF WAY, AND PRIOR MINERAL RESERVATIONS AND CONVEYANCES OF RECORD.
In 2014, Ginger filed suit against appellees Al and Penny McCone, alleging disputes had arisen regarding the ownership of a boat dock Ginger claimed was located on her property and regarding the division of electric and water bills. The McCones answered the complaint and counterclaimed, alleging they were the owners of the property in question, and the boundary line had been established by either acquiescence or adverse possession; the deeds should be reformed to reflect as much; and there were agreements in place regarding water and sewer payments, which agreements should be enforced. The circuit court determined the boundary line between the properties had been established by acquiescence and quieted title to the property in the McCones. Ginger now appeals.
Standard of Review
Boundary-line cases are reviewed de novo. Whitecotton v. Owen , 2016 Ark. App. 120, 487 S.W.3d 380. However, our court will not reverse findings of fact unless they are clearly erroneous. Stadler v. Warren , 2012 Ark. App. 65, 389 S.W.3d 5. A finding of fact is clearly erroneous when, although there is evidence to support it, we are left with the definite and firm conviction that a mistake has been committed. Id. Because the location of a boundary is a disputed question of fact, we will affirm the circuit court's finding unless it is clearly against the preponderance of the evidence. Whitecotton, supra . In reviewing a circuit court's findings of fact, we give due deference to the circuit court's superior position to determine the credibility of the witnesses and the weight to be accorded their testimony. Stadler, supra .
Hearing Evidence
At the hearing, Ginger testified she and Scott had purchased their property from Danny Winchester in 2008 by warranty deed, and Scott transferred the property to her by quitclaim deed pursuant to their divorce decree. She stated when she and Scott purchased their property, the property next door was vacant; since she owned her property, she had used the dock that is the subject of this litigation, having even hosted multiple family functions on the dock; she had never previously had issues using the dock; and she claimed the dock belonged to her, although she did not originally know where the specific boundary line was located. Ginger testified that the first time she was aware there was an issue with the boundary line was when Al McCone called her now deceased husband, Tony Hamil, and told him "not to step foot" on his property. After that, she had a survey performed that indicated the boundary line intersected the bayou on the east side of the dock, thereby placing the dock on her property; she placed a string marking where the survey indicated the property line was, which the McCones repeatedly took down; and the McCones posted a "no trespassing" sign on the dock. Prior to the lawsuit with the McCones, Ginger said she never had a reason to know where her property boundary was located, nor did she have a reason to make an agreement about where the boundary line should be.
On cross-examination, Ginger stated the house on her property was there when she purchased the property in 2008; Glynn Atkins owned the home next door; the dock was already built at the time she purchased her property; there was and still is a sewer pump on the premises; and there *910 was a light pole near the crest of the bayou bank. However, she denied she had ever been told the boundary line between her property and the McCone property was the line between the sewer pump and the light pole. Ginger acknowledged the McCones demolished the Atkins home after they purchased the property; she further admitted she did not discuss the location of the boundary line with the McCones prior to 2014, when she had a survey performed.
Al testified he did not have his property surveyed when he purchased it from the Atkinses, but a survey performed later showed he owned what he was told was his property at the time of the purchase. Al stated the old Atkins house on his property had been damaged in a storm; it was too expensive to repair and was torn down; and a mobile home was placed on the property, although not in the same place as the old Atkins home because the mobile home was too long for that space. Al said Ginger's asserted boundary line would have gone through the middle of the old Atkins house, although it would not go through the mobile home because it was in a different location. Al testified he learned of the boundary dispute, including ownership of the dock, when Ginger emailed him a survey with a boundary line crossing his property.
On cross-examination, Al testified Ginger was the person who first showed him the north boundary of the Atkins property, telling him that the boundary line was from the telephone pole, across the top of the sewer system, and out to the road. He further testified that Ginger reiterated that the sewer system was the boundary line when she assisted him in measuring his property for placement of his new mobile home, and she never told him not to demolish the old Atkins home because it was on her property. In fact, while the contractor was tearing down the Atkins house, the water line was broken, and according to Al, Ginger called him and told him that his water line was broken and needed to be fixed. Al testified if the circuit court adopted Ginger's proposed boundary line, he would not have any usable bayou frontage, including the dock at issue.
Josh Martin, the surveyor who performed Ginger's survey, testified he performed the survey based on the property description found in the quitclaim deed from Scott to Ginger, not the property description contained in the deed from the Atkinses to the Jameses. Martin admitted that the conveyance from the Atkinses to the Jameses did not say "one-half of the lot" and that the survey he prepared based on one-half of Lot 1 was not consistent with the description conveyed from the Atkinses to the Jameses. Martin explained that monuments are anything that can be placed in the ground that can be found and used to measure property descriptions; he agreed that while the normal items used by surveyors were iron pins, a tank in the ground or a utility pole could also be used as a monument.
Drew McCord, the surveyor who performed a survey of the subject property on behalf of the McCones, testified he was hired to do a partition survey on Lot 1 according to the legal description of what Glenn Atkins intended the boundary line to be. McCord stated he did not find a deed description that fit the survey he made and that Glenn Atkins's intentions were not what was recorded at the time of the conveyance. McCord testified that his survey was performed to determine a legal description with two monuments serving as the boundary line between the properties; he further stated if the survey prepared for Ginger was used, the boundary line between the two properties on that *911 survey would have dissected the old Atkins house.
Glynn Atkins, the original owner of both parcels of property, testified he sold a part of his property to the Jameses in 1993 and kept the remaining portion of the property. He explained that after the lot was divided, both he and the Jameses built fishing camps on their properties and installed a joint sewer system that could be run from either camp. Atkins testified the sewer system was placed on the boundary line between the two properties so there would be no question about where the boundary line was located, the sewer system was marked by a butane tank, and it had always been that way. Atkins further stated that back toward the bayou, he had placed a utility nightlight for the benefit of both parties. Atkins testified he built a dock on his side of the property line; Ginger had asked permission to use the dock, and he had allowed her to do so; Ginger mowed his grass in exchange for allowing her to use the dock; and he allowed other friends to use his dock as well. Atkins testified he never intended to part with any property south of the sewer-system boundary line; he never had any dispute with any of the subsequent purchasers of the James property regarding the boundary line until Ginger; everyone respected the boundary line except Ginger; when he sold his property to the McCones, he told them the boundary line was between the sewer system and the utility light pole; and when he sold his property to the McCones, he intended to sell them both his house and the dock.
Robert Toth, a friend of Al McCone's, testified that in 2013, he went with Al to the McCone property to measure and place the mobile home, and Ginger was present. Toth stated he heard Ginger tell Al that the sewer grinding tank was on his property but that the controls for the tank were on her property; they measured from the sewer system to see if the mobile home could be placed in that location; Ginger did not argue with where they were measuring; and he believed Ginger knew exactly where her property line was located, as she did not disagree with the property line from which they were measuring. Toth said there was not enough space between the two property lines to place the mobile home where Al initially wanted it, and Al had to move its location.
Appellee Penny McCone testified she and Al learned the Atkins property was for sale because Ginger told Penny's stepson about it; Ginger met them at the property and showed them the house; and Ginger showed them the location of the property line. Penny admitted a survey was not performed prior to purchasing the property, but they knew where the northern boundary of their property was located because Glynn Atkins and Ginger had told them. Penny said when the old Atkins house was torn down, they made renovations to the lot, including bringing in a load of sand to fill a hole caused by the demolition of the old house, and Ginger never told them not to make those changes. She also said she gave Ginger permission to use the dock.
Ginger was recalled as a rebuttal witness. She denied any discussion of the boundary line was had when Al and Toth took measurements to place the mobile home; she had never heard anyone refer to the septic-tank grinder or the utility pole as boundary lines between the properties; and she denied she had ever sought permission from anyone to use the dock, stating she had simply used the dock continuously since the time she had purchased her property.
The oral depositions of Rowena James and Scott Durham were also introduced into evidence. James testified that her late *912 husband, Joseph James, was a friend of Glynn Atkins; Atkins sold them some property in 1993; and both couples built camp houses on their properties. Rowena testified Glynn Atkins built a dock; while she stated that she did not know where the boundary line was located, she knew it did not run through the Atkins house and that Atkins would not have built his house on their property.
Scott testified the only discussion he had of the boundary line between the properties was with Glynn Atkins, and when he asked Atkins where the property line was located, Atkins told him the line was from the center of the sewer system to the utility pole. Scott testified he and Ginger respected that line as the boundary between their property and the Atkins property. Scott further testified he and Ginger used Glynn Atkins's dock; Atkins did not mind that they used the dock; in return they kept his yard mowed; and he (Scott) never believed the dock belonged to him. Scott denied he and Ginger had purchased the Atkinses' dock.
The circuit court found a boundary by acquiescence had been established between the two properties, which was the line between the sewer system and the utility pole. The circuit court specifically found, "The evidence ... is overwhelming that the boundary was recognized, considered and agreed upon by the original grantor, Mr. Atkins, and that the land marks were identified. Further, it has never been the intent by Mr. Atkins to convey any property to Ms. Durham south of the recognized boundary line." The circuit court dismissed Ginger's petition and quieted title in the property, including the boat dock, in the McCones.
Boundary by Acquiescence
In Myers v. Yingling , 372 Ark. 523, 527, 279 S.W.3d 83, 87 (2008), our supreme court held, "Whenever adjoining landowners tacitly accept a fence line or other monument as the visible evidence of their dividing line and thus apparently consent to that line, it becomes the boundary by acquiescence." A boundary line by acquiescence is inferred from the conduct of the landowners over many years that implies the existence of an agreement about the location of the boundary line; in such circumstances, the adjoining landowners and their grantees are precluded from claiming that the boundary so recognized and acquiesced in is not the true one, although it may not be. Clark v. Caughron , 2017 Ark. App. 409, 526 S.W.3d 867. A boundary by acquiescence is usually represented by a fence, a turnrow, a lane, a ditch, or some other monument tacitly accepted as visible evidence of a dividing line. Brown v. Stephens , 2009 Ark. App. 614, 2009 WL 3029308. A boundary line by acquiescence may exist without the necessity of a prior dispute. Myers, supra .
Ginger argues there was insufficient evidence of a physical boundary line as well as insufficient historical usage of such a boundary so as to establish a boundary by acquiescence. She first complains the circuit court's order mentions only two reference points-the light pole and the sewer pump-with regard to the entire boundary, and such evidence is insufficient to conclude those two points had any significance as an established boundary. She further argues that there was no evidence of usage by the parties that would establish that the sewer system and the light pole were the boundary line.
We disagree with both of her arguments. First, a boundary by acquiescence may be represented by monuments tacitly accepted as visible evidence of a dividing line. Brown, supra . Josh Martin, Ginger's surveyor, testified monuments are identifiable items placed in the ground that could be found and used to measure property descriptions. During his testimony, Martin *913 agreed a tank in the ground or a utility pole, the items that formed the boundary line between the properties in this case, could be used as monuments. In Disney v. Kendrick , 249 Ark. 248, 458 S.W.2d 731 (1970), a boundary by acquiescence was affirmed when the parties tacitly agreed on a line running between two concrete stobs. Here, the monuments were identifiable, and all property owners prior to Ginger's sole ownership agreed that the sewer system and the utility pole formed the boundary line between the two properties. Furthermore, there is no requirement of adverse usage to the boundary in order to establish a boundary by acquiescence. Myers, supra . In the present case, with the exception of Ginger, the present and prior property owners who testified stated that the sewer system and the utility pole were understood to form the boundary line between the properties. The circuit court's decision was not clearly against the preponderance of the evidence; therefore, it is affirmed.
Affirmed.
Abramson and Vaught, JJ., agree.