Cite as 2021 Ark. App. 120

# ARKANSAS COURT OF APPEALS

DIVISION IV
No. CV-19-931

| | |
|---|---|
| | **Opinion Delivered:** March 10, 2021 |
| MARK WAGGONER | |
| APPELLANT | APPEAL FROM THE LONOKE COUNTY CIRCUIT COURT [NO. 43CV-17-534] |
| V. | |
| DANIEL ALFORD AND JENNIFER ALFORD | HONORABLE SANDY HUCKABEE, JUDGE |
| APPELLEES | AFFIRMED |

## MIKE MURPHY, Judge

This matter concerns the ownership of land (.828 acres) that adjoins the eastern boundary of appellant Mark Waggoner's land to the western boundary of land owned by appellees Jennifer and Daniel Alford. Waggoner filed suit seeking to eject the Alfords from the disputed property and to remove all encroaching structures, including the Alfords' house, which was partially constructed. The Alfords counterclaimed asserting that they are the owners of the disputed property by adverse possession or, alternatively, boundary by acquiescence. After a bench trial, the Lonoke County Circuit Court entered an order denying Waggoner's claim for ejectment and quieting title in the disputed property to the Alfords. For the following reasons, we affirm.

The Alfords purchased land adjacent to Waggoner's land, built a house, and moved in in July 2008. Before purchasing the land, the Alfords walked the land and recalled a fence running from north to south. The Alfords had a survey completed in July 2008 showing

that their house was twenty-seven feet from the property line. A May 2017 survey commissioned by Waggoner in contemplation of this suit, however, revealed that the Alford residence encroached at least thirty-two to thirty-three feet onto Waggoner's property. A survey completed in October 2017 on behalf of the Alfords made a similar finding.

The circuit court conducted a bench trial in August 2019. Waggoner testified that he has lived on his land since the 1990s. He explained that he raises horses and that he rolled wire next to his trees on his property to keep the horses from injuring themselves in the wooded area on the eastern boundary of his property. He testified that he never intended the wire to act as a boundary line because he knew his property line extended beyond where he placed the wire. He testified that the Alfords' house and their playground equipment had been on his property for nine or ten years and that he has never seen them maintain the disputed property. He said that he has maintained the property by moving big rocks and picking up limbs, which he does two to three times a year. He explained there is no barrier between his property line and the Alfords'. Waggoner testified that in 2015 he sent a letter to the Alfords asking them to stop cutting trees on his property.

On cross-examination, Waggoner acknowledged that the Alfords' survey identified the western boundary as "fence line (existing woven wire, poor condition)" but that he believed the survey was incorrect because there is not a fence behind their house. He noted that the wire he used to contain his horses had been in use for only two to three years. Waggoner testified that he spoke several times with the Alfords about the disputed property. He explained that he first raised the issue before the house was completed, sometime before 2008. He then corrected his earlier testimony that he sent the Alfords a letter asking them

to stop cutting trees on his property sometime between 2016 and 2017, not in 2015. He testified about one other time within the past ten years when he explained to them that he knew they were over the property line.

Steven Beadle testified that he conducted a survey for Mark Waggoner on May 5, 2017. He testified that the Alfords' lot is mostly wooded except for the area right around the house and that Waggoner's lot is also hilly and wooded. He testified that he did not notice any sort of wire to the west of the residence. He explained that the corner of the residence is 32.7 feet across the property line and that the playground equipment is 38.9 feet from the corner of the house. He stated that west of the playground equipment is wooded. Lastly, he testified that he did not observe any other survey markers or flags while conducting the survey.

Jay O'Neal testified that he is a homebuilder and developer and knows Waggoner's property well. He testified that the plot plan that the Alfords presented to the city to apply for their building permit showed that the house would be twenty-seven feet from the property line but that the house did not end up being built there. When asked why he thought that happened, he responded, "[S]omeone didn't do their job is all I can tell you." On cross-examination, he testified that he and Waggoner had plans to subdivide his property and sell it. He said he had no knowledge of the Alfords doing anything to the property to maintain it and that he has seen Waggoner mow the area one time.

Jennifer Alford testified that she has lived at her current residence since July 2008—eleven years. She testified that before buying their land, she and her husband walked the property and remembered the wire fence line being present. She testified that Waggoner

3

approached her three to six months after moving in. She explained they walked over to the disputed property and Waggoner dug around and picked up a metal pin. She testified that he came back about a year later, and they had a similar interaction. After that, Alford did not hear from him again until 2017. She testified to the maintenance and upkeep of the disputed property explaining that she and her husband take care of it by blowing leaves, pulling rocks, and killing the weeds. Alford testified that she would do this maintenance all the way to the fence line because she believed the fence to be the property line. She said that she only ever saw Waggoner on the other side of the fence.

Regarding the wire fence, Alford testified that she and her husband never asked for permission to be on any part of the disputed property because they assumed it was theirs. She said she never saw "no trespassing" signs posted, so they just always honored the fence as the boundary. Alford explained the fence is a little ragged and beat up and that it has grown into some of the trees but that it is visible and extends the entire length of the .828 acres in dispute. Daniel Alford then testified, and his testimony mirrored that of his wife.

Heather Hartsell, the Alfords' neighbor, testified that she has seen the Alfords cleaning up around the side of their house and behind the house and that she has never seen anyone else on the disputed property.

On August 16, 2019, the circuit court entered a written order finding that the Alfords had proved title to the disputed property and that Waggoner had not proved that he was entitled to have them ejected from the property. Waggoner now appeals from this order.

Boundary-line cases are reviewed de novo. *Smith v. Bowser*, 2020 Ark. App. 425, at 5–6. This court will not reverse findings of fact unless they are clearly erroneous. *Id*. A

finding of fact is clearly erroneous when, although there is evidence to support it, we are left with the definite and firm conviction that a mistake has been made. *Id.* Because the location of a boundary is a disputed question of fact, we will affirm the circuit court's finding unless it is clearly against the preponderance of the evidence. *Id.* The circuit court did not specify the basis for its ruling, so the parties have argued both bases pleaded by the Alfords in their petition—adverse possession and boundary by acquiescence.

In *Myers v. Yingling*, 372 Ark. 523, 527, 279 S.W.3d 83, 87 (2008), the supreme court held that "whenever adjoining landowners tacitly accept a fence line or other monument as the visible evidence of their dividing line and thus apparently consent to that line, it becomes the boundary by acquiescence." A boundary line by acquiescence is inferred from the landowners' conduct over many years so as to imply the existence of an agreement about the location of the boundary line. *Crum v. Siems*, 2019 Ark. App. 232, at 4–5, 575 S.W.3d 612, 615. In such circumstances, the adjoining owners and their grantees are precluded from claiming that the boundary so recognized and acquiesced in is not the true one, although it may not be. *Id.* A boundary by acquiescence is usually represented by a fence, a turn-row, a lane, a ditch, or some other monument tacitly accepted as visible evidence of a dividing line. *Id.* This court has repeatedly held that a fence, by acquiescence, may become the accepted boundary even though it is contrary to the survey line. *Smith*, 2020 Ark. App. 425, at 7. Whether a boundary line by acquiescence exists is to be determined on the evidence in each individual case. *Clark v. Casebier*, 92 Ark. App. 472, 477, 215 S.W.3d 684, 686–87 (2005).

Waggoner first argues that the court erred in finding a boundary by acquiescence because the parties did not mutually consent to the arbitrary boundary. He contends that he knew where his property line was located and that he had no intention of the wire fencing being confused for the boundary. This argument lacks merit because tacit acceptance will sustain a finding of acquiescence. *Whitecotton v. Owen*, 2016 Ark. App. 120, at 6, 487 S.W.3d 380, 384. Express recognition or agreement between the parties is not necessary, and silent acquiescence is sufficient when mutual recognition of the boundary line can be inferred from the conduct of the parties over a period of years. *Id.*; *see also Thurlkill v. Wood*, 2010 Ark. App. 319, 374 S.W.3d 790.

The Alfords' testimony that they have maintained and improved the disputed property without any objection from Waggoner since 2009 until suit in 2017 is substantial evidence of silent acquiescence that the wire fence line reflected the boundary between the two properties. And while we acknowledge that Waggoner did testify that the wire fence had been around only one to two years, the Payne survey identified the fence as in "poor condition," and there was testimony that the fence was ragged, had been present for a long time, and had grown into the trees in places. Jennifer testified that she and her husband had performed maintenance and upkeep on the disputed property—from their land to the fence. This evidence supports the finding of a boundary by acquiescence. In reviewing a circuit court's findings of fact, we give due deference to the circuit court's superior position to determine the credibility of the witnesses and the weight to be accorded their testimony. *Id.*

6

Waggoner cites *McJunkins v. McJunkins*, 2018 Ark. App. 293, 550 S.W.3d 895, to support his argument that there must be mutual recognition that a fence acts as a boundary line. In *McJunkins*, this court affirmed the finding that the plaintiffs had failed to prove that a wire fence used to separate cattle from hogs was mutually accepted as a boundary line established by acquiescence. There, the disputed property had, at one point, been a part of a larger family farm. The parties were relatives. The circuit court noted that all parties were aware of when and why the fence had been built, and it was not for the purpose of designating the property line between the families' tracts of land. Thus, the circuit court found that there was no mutual recognition that the wire fence was a boundary line. *McJunkins* is distinguishable because, here, the fence was present when the Alfords purchased their property, and testimony of the conduct of the parties supports the finding that they treated the fence as the boundary between the properties.

A preponderance of the evidence supports a finding that the parties tacitly agreed that the fence represented the boundary between the properties. Thus, the circuit court did not clearly err in finding a boundary by acquiescence and quieting title accordingly. Because we can affirm Waggoner's first point, we do not need to reach his remaining arguments concerning adverse possession.

Affirmed.

HARRISON, C.J., and WHITEAKER, J., agree.

*Alexander Law Firm*, by: *Daniel C. Brock* and *Hubert W. Alexander*, for appellant.

*McMullan & Brown*, by: *Amy Clemmons Brown*, for appellees.