Cite as 2025 Ark. App. 179

# ARKANSAS COURT OF APPEALS
DIVISION III
No. CV-23-680

|  |  |
|---|---|
| JOEY A. HIPP, SUSAN M. HIPP, AND KENT J. HIPP<br><br>APPELLANTS<br><br>V.<br><br>REX COTTRELL AND BRIANNA COTTRELL<br><br>APPELLEES | Opinion Delivered March 19, 2025<br><br>APPEAL FROM THE FAULKNER COUNTY CIRCUIT COURT<br>[NO. 12CV-20-107]<br><br>HONORABLE HOLLY MEYER, JUDGE<br><br>AFFIRMED |

**CINDY GRACE THYER, Judge**

Joey A. Hipp, Susan M. Hipp, and Kent J. Hipp appeal a Cleburne County Circuit Court order that quieted title in certain real property to Rex Cottrell and Brianna Cottrell. On appeal, the Hipps argue that we should reverse the order and remand for an award in their favor as owners of the disputed real property on the basis of boundary by acquiescence. We affirm.

I. *Facts and Procedural History*

The Hipps are fee-simple owners of certain real property in Cleburne County, which they own as joint tenants with right of survivorship. Their property is bounded to the north

by property owned by Brianna and Rex Cottrell.[1] At one time, an old barbed-wire fence ran from east to west at a slight angle on the Cottrells' property. The fence was overgrown, and the wire was strung on wooden fence posts and between trees. The distance between the fence and the Cottrells' deeded property line to the south varied from 18.90 feet on the eastern end to 51.66 feet on the western end and encompassed approximately half an acre.

In December 2018, the Cottrells removed the fence. In anticipation of erecting a new fence on the deeded property line, they had the property surveyed, removed some trees, and marked others for removal.

In June 2020, the Hipps filed a complaint for trespass and to quiet title, claiming the old barbed-wire fence established a boundary by acquiescence and that they owned the strip of land south of the fence, making the Cottrells' removal of trees improper. The Cottrells moved to dismiss the complaint, alleging that it failed to state facts upon which relief could be granted, or in the alternative, they requested a more definite statement.

The Hipps responded to the motion and filed an amended complaint for trespass and to quiet title. The amended complaint attached the warranty deeds to the two parcels, a survey showing the location of the fencing, and a picture of the fence before its removal. The Cottrells answered the complaint, generally denying the allegations contained therein and renewing their previous motions to dismiss or for a more definite statement.

---

[1]The parties purchased their respective properties within a month of each other, with the Cottrells' deed being filed in February 2015 and the Hipps' deed being filed in May 2015.

In December 2022, the Cottrells filed a counterclaim seeking to quiet title in the disputed strip of land in them and for a declaratory judgment that their warranty deed was valid. The Hipps moved to strike the counterclaim as untimely, which the Cottrells denied. The court denied the motions after a hearing on the motions to dismiss and to strike, and the Hipps answered the counterclaim, denying that the Cottrells were the owners of the disputed strip of land.

Multiple witnesses were called to testify at trial.

Kent Hipp testified that he and his parents purchased the property to the south of the fence in May 2015 and that he had lived on the property since they purchased it. He stated that the Cottrells' predecessors in interest, Alton and Margie Hipp,[2] had owned the Cottrell property for sixty to seventy years before selling their interest to the Cottrells.

Kent claimed that, although no survey had been done, he walked the property before he bought it. At the time, there was an old barbed-wire fence at the north end of the property. He believed the fence to be the property line because the property on one side of the fence was wooded and the other side was pasture and because the fence had been in existence long enough for it to have grown into the trees. He also claimed there was a corner marker in the fence row from an older survey, but when the fence was removed in November or December 2018, new survey markers were placed. He admitted he had not been told that the old fence

---

[2]Margie and Alton Hipp were Kent's great aunt and uncle. The Cottrells allowed them to continue to live on the property until their deaths.

3

was the boundary line and that his belief that it was the boundary was his own subjective belief. He further admitted that after he moved into the house, he did nothing to maintain the property near the fence line.

Kent then testified that he and his father inspected the area after the new survey lines had been marked.[3] The survey markers had been placed fifty feet from where the old fence had been located. Kent discussed the survey markers with Rex, and Rex initially said he was going to build the new fence in the location of the old, but he later stated he had decided to place the fence on the survey line.

Kent claimed that the Cottrells had never disputed that the fence was the boundary line until they had the property surveyed. He believed the Cottrells had two surveys done—one before the fence was removed and one after. He stated he was unaware of two prior recorded surveys that were consistent with the most recent survey, which had identified the Cottrells as owning the disputed strip of land.

As for the use of the property, Kent testified that his great aunt and uncle had raised chickens and grazed cattle on the property and that the fence was probably built for the purpose of containing their cattle. He acknowledged that people routinely erected fences to keep in their cows and that fences are not always placed on the property line. He was not aware whether his great aunt and uncle had identified the fence as the boundary line.

---

[3]The Cottrells later placed a temporary fence twenty to thirty feet south of the old fence line. Kent assumed the fence was placed so that Rex could corral his cows since he still used the property for grazing.

Because the original fence had been removed, Kent hired surveyor Perry Sayles to establish where the old fence line was. Kent did not have a full survey prepared, however, because he wanted a survey of only the disputed strip of land. That survey was prepared using the location of the barbed wire that had grown through the trees.

Perry Sayles testified that he prepared the survey for Kent depicting the old fence line and the contested strip of land. He stated he did not disagree with the legal boundary line contained in the previous surveys that were created on the deed description. He further testified that he frequently sees barbed-wire tree-line fences and acknowledged that fences were not always located on the actual boundary lines. He stated that fences are sometimes placed to corral cattle to prevent the cows from getting into the trees. Accordingly, its placement may or may not designate a boundary. He recommended that every landowner obtain a survey before purchasing property for this reason.

Blake Thomas testified that he prepared the Cottrells' most recent survey. He said that his survey corresponded to the two prior surveys that had been done on the property; however, the old fence line had been removed before he prepared his new survey. He stated that he regularly sees old tree-line fences in his line of work, and they rarely if ever actually fall on the boundary line. He stated that those types of fences are commonly used to keep in cattle. Also, using barbed wire around trees saves time and money. He did admit that people frequently agree to use a fence line as a boundary despite what a survey may show.

Michael Hipp testified that Alton and Margie were his parents, and he grew up on what is now the Cottrell property. He testified that he is familiar with the old fence line. He

testified that his parents raised chickens and grazed cattle on the property. While he testified that a tree line to the east of the property had always been known to be the boundary between his parents' property and his aunt and uncle's property, he did not say the same about the old southern fence line. He stated that his dad built the fence and that, to his knowledge, nobody from the north side of the fence had used the area to the south of the fence for any reason. He stated he was uncertain whether the Hipps' predecessors in interest believed the fence to be the boundary line between the two properties.

Joey Hipp testified that he, along with his wife and Kent, owns the property to the south of the old fence line but that only Kent lives on the property. He said he was very familiar with the Cottrells' property because the property had been owned by family that he would visit and because he also squirrel hunted in the area. As a result, he was very familiar with the old fence row, and he believed the fence line was the boundary line to the property.

He stated that he spoke with Rex when he discovered the survey markers. The initial survey markers were only eight feet from the old fence line, and at that time, Rex was thinking of replacing only the fence line. Then, after getting another survey done, Rex decided he was going to move the fence fifty feet from the fence line into what Joey believed was his property. Joey told Rex that the fence had been the property line for as long as he could remember. However, Joey admitted that the people he purchased his property from never said that the fence line was the property line.

Dale Galloway, who had owned the Hipp property at one time, also testified. Dale stated that he never considered the old fence row to the be the property line; he never agreed

6

with anyone that it was the property line; and he never treated it as the property line. He testified that he never discussed whether the fence line was the property line with either Margie or Alton Hipp, and he never told the Hipps' immediate predecessors in interest that the fence line was the boundary line.

Vicki Stark testified that she had been interested in buying the Hipp property before they purchased it. She stated that when they viewed the property, no one made any representations about where the boundary of the property was.

Rex Cottrell was the last witness. He testified that before he bought the property from Margie and Alton Hipp, he owned an adjoining piece of property. He stated that he had very little interaction with Kent or Joey before the dispute over the fence. He stated that he decided to tear down and build a new fence because the old one was worn out and had holes in it, and he was afraid his cows would get tangled up in it; tearing it down was a safety issue. He claimed that the old fence was just there to hold the cows in; he did not believe it was the property line; and he had never treated it as such. He said that he had the survey done because he did not believe it was on the property line. He never saw his neighbors maintain or hunt on the property near the fence.

Rex did not dispute that the fence had been there a long time, he just disputed that it was considered the property line. He stated that when he first purchased the property, he hired someone to do some dozer work, and he had the person move the rock monuments at the corner of the property. He did not know the significance of those rocks at the time. He said there was also a piece of rebar in the fence row, but it got removed and misplaced when

7

he had the dozer work done to build a hay barn. That is when he hired Thomas to complete a survey so he could find the corner again and so he could build his fence.

Rex stated that he maintained the pasture side of the fence where he grazed his cattle, but he did not maintain the other side of the fence. He did place no-trespassing signs on his property before the lawsuit was filed. As for the fence, he said that people build fences into the trees because it is easy and saves time and money. Those types of fences are common and are built to keep animals from roaming. He testified that he had other fences on his property to contain his cattle, and they were not boundary lines either.

He further testified he never treated the old fence as his boundary line. He explained that, at one point, he had a deer stand in the fence line with its feet over on the south side of the fence. He could not say how long it was there, because he moved his deer stands frequently but thought that one had been there two to three years. He stated that he also hunted to the south of the fence line and that the Hipps' predecessors in interest would let him hunt on their property. He stated that they never took any action to lead him to believe that they intended for the fence to be the property line. He stated he never agreed for the property line to be anything other than the survey line. As for the Sayles survey the Hipps had prepared, he disputed its accuracy and explained how it was inaccurate.

On cross-examination, Rex testified that he never spoke to Margie or Alton Hipp about the fence being the boundary line, and he did not have a survey done before he purchased the property. He further admitted he had a survey done before the Thomas survey, but never got a physical document of the survey. The surveyor placed a post approximately

ten to fifteen feet from the fence line. Rex stated he had to get a second survey because he could never get back in touch with the first surveyor.

Multiple pictures and Google Earth photographs were introduced depicting the properties over time.

On May 17, 2023, the circuit court issued a letter opinion finding in favor of the Cottrells. The court determined that the Hipps had not met their burden of proof on their claim of boundary by acquiescence and denied their petition to quiet title and request for damages in trespass. The court then granted the Cottrells' petition to quiet title and declared their deed valid and free of any cloud or claim by the Hipps.

In support of its decision, the court found that the Hipps had proved the existence of the old fence, which was the crux of the suit. What they failed to prove, however, was that for a significant period of time, landowners of both sides of the fence acquiesced to the fact that the fence was the boundary.[4] The court noted that the Cottrells clearly did not acquiesce and testified that they had used the disputed strip south of the of the old fence to hunt. The court did not hear from the Cottrells' predecessors in title because they unfortunately were deceased. The Hipps' witnesses testified to the existence of the fence but not to the intent of the Cottrells' predecessors in interest regarding the boundary line. The Hipps testified that,

---

[4]The court also indicated its dismay that the Cottrells or their agents had removed survey markers. The court noted that such conduct was unacceptable, whether or not intentional. The court stated that, while it would never approve of a party benefiting from bad conduct, the court found that the outcome of this case would not be any different under the circumstances of this case.

during their ownership of the adjoining property, they did not possess or occupy the disputed strip south of the fence. Mr. Galloway, the Hipps' predecessor in title from 2000–2005, testified that he did not think the fence was the boundary line; rather, he thought the survey line was the boundary. The court, having considered the foregoing evidence, found that the Hipps' belief that the fence was the boundary was their own unilateral, subjective belief and was not supported under the facts or the law.

A final order reiterating the court's findings of fact and conclusions of law was filed on June 26, 2023, and the Hipps filed a timely notice of appeal from that order. On appeal, the Hipps challenge the circuit court's finding that they had failed to prove a boundary by acquiesce and its quieting of title in favor of the Cottrells.

## II. *Standard of Review*

We recently reiterated our standard of review in quiet-title and boundary-line actions as follows:

> We review quiet-title and boundary-line actions de novo. Because the location of a boundary is a disputed question of fact, we will affirm the trial court's finding unless it is clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. In reviewing a trial court's findings of fact, the appellate courts give due deference to the trial court's superior position and the weight to be accorded the testimony.

*William N. Gillison Revocable Tr. v. William W. Bunker & Claudia M. Bunker Joint Revocable Tr.*, 2024 Ark. App. 136, at 9, 685 S.W.3d 306, 311 (citations omitted).

## III. *Discussion*

The Hipps submit that the record before us contains undisputed evidence that a barbed-wire fence on the Cottrells' property acted as the boundary line between their two contiguous pieces of property and that they are entitled to the property between the fence and the property line through boundary by acquiescence. In support of their claim, they point to the following "undisputed" facts introduced at trial: (1) Rex Cottrell acknowledged by his actions that the fence was the boundary line; (2) the fence had been in place for as long as sixty years; (3) a surveyor's pin and flag were located in the old fence row before Cottrell removed it, indicating that, at some time in the past, a survey had located the fence as a boundary; (4) Google Earth aerial photographs of the property in dispute, spanning the years from 1994–2020, established that there was an old fence line and that the Cottrells' property on the north side of the fence was consistently mowed for pasture, whereas the Hipps' property on the south side of the fence was consistently brush and trees; (5) Michael Hipp, the son of the Cottrells' predecessors in interest who grew up on the property, testified that the fence was always considered the boundary line between the ownership of the two properties; and (6) Joey Hipp, the nephew of the Cottrells' predecessors in interest who grew up hunting in the area, testified that the fence was considered the boundary line between the two properties.

The Hipps claim that the evidence clearly shows that the boundary between the parties should be inferred from the parties' long-continued acquiescence and their actions relative to the line.

11

Boundary by acquiescence may arise "without the necessity of adverse use to the line." *William N. Gillison Revocable Tr.*, 2024 Ark. App. 136, at 10, 685 S.W.3d at 312 (quoting *Myers v. Yingling*, 372 Ark. 523, 530, 279 S.W.3d 83, 89 (2008)). A boundary by acquiescence arises from conduct of adjoining landowners over many years that implies an agreement to treat some visible marker as their boundary, wherever the true boundary might be. *Id.* A boundary by acquiescence is usually represented by a fence, a turnrow, a lane, a ditch, or some other monument tacitly accepted as visible evidence of a dividing line. *Id.* Under these circumstances, the adjoining owners and their grantees are precluded from claiming that the boundary so recognized and acquiesced in is not the true one, although it may not be. *Id.*

Whenever adjoining landowners tacitly accept a fence line or other monument as the visible evidence of their dividing line and apparently consent to that line, it becomes a boundary by acquiescence. *Id.* A boundary line by acquiescence is inferred from the landowners' conduct over many years so as to imply the existence of an agreement about the location of the boundary line. *Id.*

Boundaries are frequently found to exist at locations other than those shown by an accurate survey of the premises in question and may be affected by principles of acquiescence and adverse possession. *See Summers v. Dietsch*, 41 Ark. App. 52, 849 S.W.2d 3 (1993). A fence, by acquiescence, may become the accepted boundary even though contrary to the survey line. *Id.*

Even if there never was an express agreement to treat a fence as the dividing line between the two parcels of land, such an agreement may be inferred by the action of the

parties. *See Kittler v. Phillips*, 246 Ark. 233, 437 S.W.2d 455 (1969). Thus, tacit acceptance of a fence line or other monument as the visible evidence of the dividing line for a long period of time manifests apparent consent. *See Summers*, *supra.* The property owners and their grantees are then precluded from claiming that the boundary line thus recognized and acquiesced in is not the true one, although it may not be on the survey line. *Id.*

Here, on a de novo review of the record, the court's findings of fact are not clearly erroneous. It is undisputed that there was an old barbed-wire fence through the trees approximately fifty feet from the surveyed boundary line. There was absolutely no testimony that any of the parties' predecessors in interest informed the parties that the fence was the boundary line. In fact, one of the predecessors in interest, Dale Galloway, testified that he did not consider the fence to be the boundary line. In their brief, the Hipps claim that Michael considered the fence line to be the property line, but his testimony was not quite so clear. Instead, he merely testified that he was aware of the fence line and that it had been there a long time. Additionally, multiple witnesses testified that fence lines, such as the one at issue here, were frequently placed in tree in lines to contain cattle because it was cheaper and easier. Both Cottrell and his predecessors grazed cattle on the property. The only persons to testify that they considered the fence to be the boundary line were the appellants, Kent and Joey.

Having considered the entire record on appeal, we cannot say that the circuit court's findings were clearly erroneous. Accordingly, we affirm.

Affirmed.

13

HARRISON and TUCKER, JJ., agree.

*Richard Mays Law Firm PLLC*, by: *Richard H. Mays*, for appellants.

*Maureen Harrod*, for appellees.