Cite as 2026 Ark. App. 210

# ARKANSAS COURT OF APPEALS
DIVISION I

No. CV-25-132

| | |
|---|---|
| JERRY ARTER | Opinion Delivered April 1, 2026 |
| APPELLANT | APPEAL FROM THE SEARCY COUNTY CIRCUIT COURT [NO. 65CV-23-31] |
| V. | |
| NAOMI AND FRANCIS PIKE, HUSBAND AND WIFE; AND JOHN PIKE | HONORABLE SUSAN WEAVER, JUDGE |
| APPELLEES | AFFIRMED |

**WENDY SCHOLTENS WOOD, Judge**

Jerry Arter appeals a Searcy County Circuit Court order quieting title to 5.42 acres in favor of Naomi and Francis Pike ("the Pikes") and their son John Pike, finding that they established boundary by acquiescence and denying Jerry's counterclaim seeking to quiet title and to set aside a quitclaim deed from the Pikes to John as a cloud on Jerry's title. On appeal, Jerry contends that the circuit court clearly erred in finding a boundary by acquiescence and in denying his counterclaim. We affirm.

## I. *Facts*

The parties are adjoining landowners who each purchased a "quarter quarter tract" of approximately forty acres without a metes and bounds description. Jerry's property is

north of the Pikes' property. Jerry purchased his property on October 4, 2001, which is described in his deed[1] as follows:

> The Southeast Quarter of the Northeast Quarter (SE ¼ NE ¼) of Section Six (6), Township Thirteen (13) North, Range Seventeen (17) West.

The Pikes purchased their property in 2005, which is described in their deed as follows:

> The Northeast Quarter of the Southeast Quarter (NE ¼ SE ¼) of Section Six (6), Township Thirteen (13) North, Range Seventeen (17) West, containing 40 acres, more or less.
>
> SUBJECT to an Easement for road and utility purposes 16 feet wide over and across the existing roadbed which runs West from County Road No. 5 along the North boundary of the above tract, pursuant to Judgment recorded in Circuit Court Book 44 at pages 356–357.

A fence and a road run east to west near Jerry's southern boundary and the Pikes' northern boundary. The disputed 5.42 acre tract lies in that area. As stated in the Pikes' deed, their title is subject to an easement "for road and utility purposes 16 feet wide over and across the existing roadbed" that runs west from County Road 5, also known as Lick Fork Road, along the north boundary line.

In April 2019, Jerry had a survey performed, which showed that the 5.42 disputed tract south of his fence was within his forty-acre tract. The Pikes had a survey conducted in December 2019 that showed the same:

---

[1]We note that Jerry's deed contained descriptions of additional property that is not at issue in this appeal.

2



Prepared for:
Francis & Nelma Pike
Showing a part of the SE1/4—NE1/4
Sec. 6, T13N, R17W
Searcy County, Arkansas

Description of a parcel of land, long thought to be in the NE1/4-SE1/4, but actually in the SE1/4-NE1/4:

A of portion of SE1/4-NE1/4 Section 6, T13N, R17W, Searcy County, Arkansas, described as follows:
BEGINNING at the SE corner of said SE1/4-NE1/4;
thence N 87°44'59" W 1300.73' to a 1/2" rebar, with 1769 cap;
thence N 01°13'15" E 163.84' to a nail set on the west side of a pipe fence corner;
thence S 89°17'08" E 1303.54' to a point on the EAST line of said SE1/4-NE1/4;
thence S 02°04'38" W 198.75' to the POINT OF BEGINNING.
Parcel Contains 5.42 acres, more or less.

On May 18, 2023, the Pikes filed a petition to quiet title to the disputed tract alleging boundary by acquiescence and adverse possession. They alleged that there was a tacit agreement among the parties and their predecessors in title that the fence and roadway easement were their northern boundary line, specifically claiming that Jerry's fence has been in the same place for decades, and that although Jerry had made improvements to the fence, the placement of the fence had not changed. The Pikes further alleged that the parties maintained the land on their respective sides of the fence and that Jerry trespassed and removed timber on their property. Jerry filed an answer and a counterclaim to quiet title and to set aside the Pikes' April 2023 quitclaim deed to their son John because the deed included a legal description of the disputed tract.

A bench trial took place on September 26, 2024. To provide more context to the location of the parties' properties and the disputed tract, we include the following 2017 aerial photo that depicts the disputed tract within the rectangular box:



Jerry testified that he purchased forty acres north of the Pikes in 2001, has paid taxes on it ever since, and does not live there but uses it as pasture land for cattle. He said that his deed does not contain a road easement but that there is a fence and a road along the southern portion of his tract with the fence lying north of the road. Although Jerry did not have the property surveyed when he purchased it in 2001, he said that he had the southern boundary surveyed in 2019 to establish the location of the southeast corner in order to erect a fence, explaining that he wanted to build a barn and clear the land to make it a pasture. Jerry stated that his neighbor to the west, Cecil Blair, had shown him where the southwest corner was marked with a stake according to Blair's survey.

Jerry further testified that he hired Jeff Magness to build the existing road sometime around 2002 or 2003. Jerry said that before that time, it was only a "wagon road." Jerry testified that he uses the road south of the fence, clarifying that the road is within the disputed tract and that the road is not identified on his deed. Jerry said that he is on his property a couple of times of a week; he gave Alton Blair (his neighbor to the west) permission to use the road; no one has an easement to use his road; and he has never seen the Pikes on the disputed tract except walking on the road to check on a neighbor's property.

Jerry stated that the Pikes' predecessor's deed mentioned only a sixteen-foot-wide easement along the northern boundary from County Road 5, not a road. Jerry acknowledged that the 2005 deed to the Pikes' land provides for a sixteen-foot-wide easement across an existing roadbed. Jerry acknowledged a lawsuit between the Browns (a predecessor of the Pikes) and the Hendrixes (who owned the property to the west of the Brownses' property at the time) over the easement in which the court ordered the Browns to remove a gate blocking the road easement and allow the Hendrixes to use it; Jerry, however, said it was a different road.

Jerry testified that he never spoke with the Pikes about the fence being the property line and that it is not uncommon for people to build their fences off of their property lines. Jerry was not aware of the Pikes' claim to the disputed tract until he received a "cease and desist" letter from their attorney in April 2023 after Jerry cut several trees in the disputed area. Jerry said he uses the disputed tract "all the time," the Pikes saw him use it, and the

Pikes' predecessors never questioned his use of it. He stated that he bought 40 acres, not 34.58 acres, and the Pikes bought 40 acres, not 45.42 acres.

Harold Hendrix, who was seventy-four years old, testified that he was aware of the road in 1996 when he purchased his forty-acre tract to the west of the Pikes' property because it had been in the same location all his life. He said he was granted a sixteen-foot easement across the north boundary of the Pikes', which had been owned at that time by the Browns. Hendrix explained that he sued the Browns because they placed a gate at the beginning of Lick Fork Road, which prevented him from using the easement. Hendrix said that the Browns were ordered to remove the gate and allow him access to the easement across the Browns' property, which is now owned by the Pikes. Hendrix said he thought the road and fence were on the Browns' property because that was how it was represented to him when he had attempted to purchase Jerry's property. Hendrix stated that he was told the road was the boundary line and thought "everybody" treated it as such. Hendrix testified that he hired Jeff Magness to redo the road because it was overgrown and was not sixteen feet wide, which required Hendrix to speak to Jerry about the road taking out part of his fence

Francis Pike, who lives on his property and has paid taxes on it since its purchase, testified that the road and the fence existed when he looked at the property several years before he purchased it. Francis said that the road was on his property at the northern boundary and that he purchased "forty acres, including the road to the fence." Francis said that his forty acres is all "treed" with a fence on four sides. He said that the fence was the northern boundary according to the title, and he treated it as such. He said that he and his

predecessors (the Hobbses and the Browns) had the same roadway-easement reservation. Francis testified that he became aware of Jerry's survey when he saw the ribbons on the property. Francis said he saw Jerry at the fence line, and Jerry told him he was going to put a fence up, which prompted Francis to have a survey performed.

Francis stated that he had never seen Jerry on the disputed tract or doing work south of the road until 2023 when he cut some trees south of the road. In fact, Francis said he had never seen anyone on the disputed tract. Francis stated that he has mowed the grass up to the fence to prevent a fire from crossing the road, has maintained the road by raking rocks out of the grass and putting them back on the road, has placed multiple firebreaks in the disputed tract, has a "semi-trailer" sitting "just over the edge of the five acres surveyed," and maintains a compost pile for his garden on the disputed tract.

Francis testified that he believed the fence was the property line because the road easement is on his property, and the fence is north of it. Francis said that he treated the fence line as the boundary, the fence line had been known to all the neighbors for years as the property line, and Jerry never told him not to do anything on the disputed tract. Francis said that he and Jerry did not have a verbal agreement that the fence line was the property line, explaining that the issue did not come up until the survey indicated it was somewhere else. Francis said he has seen Jerry and "[e]verybody else" using the road for years, explaining that Jerry accesses his pasture through a gate on the fence line. Francis said that he never told Jerry the property belonged to him because Jerry knew it did. Francis was not aware that Jerry was claiming the disputed tract as his until the 2019 survey.

7

Naomi Pike stated that she agreed with her husband's testimony regarding the deeds and ownership of their property. Naomi said that the road is on their property and that the boundary line is the fence, which has been in essentially the same location since 2005. She too said she was aware of the location of the road before purchasing their property in 2005 because they had looked at purchasing the property previously. Naomi said that her husband built firebreaks on the disputed tract and that they mowed on both sides of the road without objection. Naomi testified that she had never seen anyone on the disputed tract until 2023 when Jerry was bulldozing and taking down trees, which prompted them to hire an attorney to send a letter to Jerry. Naomi testified that the Browns, the previous owners of their property, had a house on the property that burned down, the remains of which were placed on the disputed tract. She also said that her husband's semi-trailer crosses slightly over Jerry's southern boundary according to the survey flags.

Doug Weaver, who was seventy-three years old at trial and lived near the disputed tract, testified that he has been familiar with it for sixty years and that the road and fence at issue have been in the same location the entire time. He said that he used the road many times as a "kid," describing it as a wagon trail that was not maintained but could accommodate a vehicle. He said the Pikes own the property south of the road, and Jerry owns the property north of the road. Weaver stated that he had seen the Pikes on the disputed tract planting gardens but had never seen Jerry south of the road.

David Mason testified that he had been on the road many times. He said it could be driven by car and has been in the same location since 1977. He recalled the lawsuit between

the Hendrixes and the Browns and knew both families. He said that the Browns owned the property before the Hobbses, who sold it to the Pikes. Mason testified that he saw the Hobbses in the "area" of the disputed tract "just doing everyday life." Mason also recalled that some of the debris from the Browns's burned-down house are located by the road. Mason, who knew the Pikes before their purchase, saw them on the disputed tract. He said that Francis made firebreaks and cut small trees on the disputed tract and also placed his semi-trailer at the disputed tract. Mason never saw Jerry south of the fence until the past two years and had never seen anyone use it except the Pikes.

Nathan Dearyan, who performed the Pikes' survey, testified that the disputed tract lies north of the Pikes' title and within Jerry's title. He said there is a reference in the Pikes' deed to a road but not in Jerry's, explaining that the reservation for an easement in the Pikes' deed matches the description of the disputed tract and had been that way since about 1920. He said that according to aerial photos, the location of the road had been in about the same location since at least 1980, noting that it could have moved, at most, by about forty feet. Mason said that at some point after 1997, the road was "greatly" improved and ran straighter east to west. He said that the possession line did not match the survey line, stating that although people often equate title and ownership, they do not always coincide.

Jeff Magness, a bulldozer operator who builds roads and ponds, was hired by Jerry to work on a road that was overgrown and not straight but allowed a vehicle to pass. He explained that Jerry hired him to build the east half of the road from Lick Fork Road, and Hendrix hired him to build the west half of the road. Magness said that he never had any

9

contact with the Pikes or their predecessors during the construction. Magness stated that he did not "get involved in property lines" and assumed that the property from Lick Fork Road all the way across was Jerry's because of their conversations.

Alton Blair, who lives on thirty-two acres west of Jerry's property, testified that he is familiar with the disputed tract. Alton said that he asked Jerry if he could use the road but never asked the Pikes. Alton said he had seen Francis on the disputed tract because Francis used it to visit him "every now and then." Alton knew of an easement involving the road, but he did not know whose deed had the easement.

Jerry was recalled to testify. He said that he has always treated the disputed tract as his land. He stated that when he purchased his property, he made the road wider and moved the fence to the north to "fix it around his hayfield," noting that he did not have the money to go to his southern property line. He said that the road is now in a better place for him to access his property.

Jerry said that Hendrix's testimony was inaccurate, stating that his memory is "apparently not very good anymore." Jerry said that he allowed Hendrix to build the western half of the road to access his property and that Hendrix came to him for permission, noting that the Pikes did not own their property at that time.

Jerry had no knowledge that the Pikes mowed in the disputed area but had seen Naomi walking on the road. Jerry said that he cleared an area for a barn in 2007 and stored hay on the property right along the road since 2001.

After taking the case under advisement, the circuit court entered an order quieting title to the disputed tract in favor of the Pikes on the basis of boundary by acquiescence. The court also denied Jerry's counterclaim for quiet title and to set aside the Pikes' quitclaim deed to their son John. This appeal followed.

## II. *Standard of Review*

Our standard of review in quiet-title and boundary-line cases is de novo. *Hipp v. Cottrell*, 2025 Ark. App. 179, at 10, 709 S.W.3d 844, 850. Because the location of a boundary is a disputed question of fact, we will affirm the circuit court's finding unless it is clearly erroneous. *Id.*, 709 S.W.3d at 850. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.*, 709 S.W.3d at 850. In reviewing a circuit court's findings of fact, we give due deference to the court's superior position and the weight to be accorded the testimony. *Id.*, 709 S.W.3d at 850.

## III. *Boundary by Acquiescence*

Boundary by acquiescence may arise "without the necessity of adverse use to the line." *Myers v. Yingling*, 372 Ark. 523, 530, 279 S.W.3d 83, 89 (2008) (quoting *Rabjohn v. Ashcraft*, 252 Ark. 565, 570, 480 S.W.2d 138, 141 (1972)). A boundary by acquiescence arises from conduct of adjoining landowners over many years that implies an agreement to treat some visible marker as their boundary, wherever the true boundary might be. *William N. Gillison Revocable Tr. v. William W. Bunker & Claudia M. Bunker Joint Revocable Tr.*, 2024 Ark. App. 136, at 10, 685 S.W.3d 306, 312.

11

A boundary by acquiescence is usually represented by a fence, a turnrow, a lane, a ditch, or some other monument tacitly accepted as visible evidence of a dividing line. *Id.*, 605 S.W.3d at 312. Under these circumstances, the adjoining owners and their grantees are precluded from claiming that the boundary so recognized and acquiesced in is not the true one, although it may not be. *Id.*, 605 S.W.3d at 312. Whenever adjoining landowners tacitly accept a fence line or other monument as the visible evidence of their dividing line and apparently consent to that line, it becomes a boundary by acquiescence. *Myers*, 372 Ark. at 527, 279 S.W.3d at 87. However, neither the mere existence of a fence nor one party's subjective belief or opinion that a fence is a boundary line will sustain a finding of acquiescence. *Parks v. Henderson*, 2026 Ark. App. 45, at 15. ___ S.W.3d ___, ___. There must be mutual recognition or mutual agreement of a fence (or other monument) as the dividing line before there can be any boundary by acquiescence. *Id.*, ___ S.W.3d at ___. In determining whether a fence between two tracts has become a boundary by acquiescence, the basic question is one of intention: namely, whether the adjoining landowners both meant to recognize the fence as a boundary. *Id.*, ___ S.W.3d at ___. Express recognition or agreement between the parties is not necessary, and silent acquiescence is sufficient when mutual recognition of the boundary line can be inferred from the conduct of the parties over a period of years. *Waggoner v. Alford*, 2021 Ark. App. 120, at 6, 619 S.W.3d 59, 63.

Boundaries are frequently found to exist at locations other than those shown by an accurate survey of the premises in question and may be affected by principles of acquiescence and adverse possession. *Hipp*, 2025 Ark. App. 179, at 12, 709 S.W.3d at 851. A fence, by

12

acquiescence, may become the accepted boundary even though contrary to the survey line. *Id.*, 709 S.W.3d at 851. Even if there never was an express agreement to treat a fence as the dividing line between the two parcels of land, such an agreement may be inferred by the action of the parties. *Id.* at 12–13, 709 S.W.3d at 851. As a result, tacit acceptance of a fence line or other monument as the visible evidence of the dividing line for a long period of time manifests apparent consent. *Id.* at 13, 709 S.W.3d at 851. The property owners and their grantees are then precluded from claiming that the boundary line thus recognized and acquiesced in is not the true one, although it may not be on the survey line. *Id.*, 709 S.W.3d at 851.

For his first point on appeal, Jerry contends that the circuit court clearly erred in finding that a fence line on his property was the boundary by acquiescence. Jerry argues the that the evidence did not reflect his intent or that of his predecessors to recognize the fence as the boundary; there was no evidence that the parties intended the fence to be a boundary by acquiescence; and the Pikes failed to produce any evidence that the fence was the intended boundary line. Instead, Jerry states that the Pikes relied on their own belief about where the boundary should be located. Jerry asserts that the Pikes did not use the disputed property with the exception of Francis's semi-trailer possibly being placed "barely over the property line," which Jerry contends shows their intent "not to cross the section line boundary as shown by both the parties' surveys as the true boundary line." Jerry further contends that "evidence of a possible misdescribed easement in the [Pikes'] deed alone does not establish the boundary line as a roadway or fence built by [Jerry] on his own property," noting that his

13

deed contains no easement. Jerry argues that the fact that the Pikes' deed was subject to an easement does not establish the boundary as the easement.

Although Jerry is correct that there must be a mutual recognition or agreement that a fence (or other monument) is the boundary line, Jerry ignores that express recognition or agreement between the parties is not necessary, and silent acquiescence is sufficient when mutual recognition of the boundary line can be inferred from the conduct of the parties over a period of years. *Waggoner*, 2021 Ark. App. 120, at 6, 619 S.W.3d at 63; *see also Whitecotton v. Owen*, 2016 Ark. App. 120, at 6, 487 S.W.3d 380, 384 (affirming boundary by acquiescence despite the appellant's argument that there was no evidence that his predecessor in title acquiesced in the boundary).

Here, the circuit court found that "several credible witnesses" testified that the road and fence had been in its present location (or close thereto) for decades before the current lawsuit; the Pikes had used and maintained parts of the disputed tract since taking title to the property in 2005; and the Pikes' predecessors (the Browns) were sued over the current roadway access by Hendrix after they blocked his access to his property. Considering the evidence in this case, we cannot say that the circuit court clearly erred in finding that the Pikes established boundary by acquiescence.

Francis testified that the road and fence were on the property when he looked at it several years before he later purchased what he described as "forty acres, including the road to the fence." Francis said that the fence was the northern boundary of his property according to the title, and he treated it as such; the fence line had been known to all the neighbors for

14

years as the property line; and he believed the fence was the property line because the road easement is on his property, and the fence is north of it. The Pikes' predecessors (the Hobbses and the Browns) had the same roadway reservation in their deeds. Francis used the disputed area without objection from Jerry, including placing firebreaks, mowing the grass up to the fence and raking the rocks from the grass back onto the road, and placing his semi-trailer at the edge of the disputed area. Naomi's testimony was consistent with Francis's testimony.

There was not only testimony from the Pikes regarding the disputed area but also from Weaver and Mason, both of whom had been familiar with the road for more than fifty years. Weaver testified that the road and fence had been in about the same location the entire time; the Pikes own the property south of the road, and Jerry owns the property north of the road; and he had seen the Pikes planting gardens in the disputed area but never saw Jerry south of the road. Mason said he had seen the Pikes' predecessors in the disputed area "just doing everyday life"; he had seen the Pikes on the disputed tract, noting that Pike had made firebreaks, cut small trees, and placed a semi-trailer in the area; and he had never seen Jerry south of the fence until the past two years.

Like Weaver and Mason, Hendrix also testified that the road had been in the same location for over fifty years, he was told the road was the boundary line, and everybody treated it as the boundary. Hendrix said that when he purchased his property in 1996, it was represented to him that the road and fence were on the Browns' property (one of the Pikes' predecessors). Moreover, Hendrix sued the Browns to remove the gate that blocked Hendrix's use of the road and was granted possession of an easement across the Browns'

15

property on the northern boundary line, which demonstrates that the parties to this lawsuit believed that the road was on the Browns' property.

Whether a boundary line by acquiescence exists is to be determined from the evidence in each case. *Whitecotton*, 2016 Ark. App. 120, at 7, 487 S.W.3d at 385. Resolution of conflicting evidence and determination of witness credibility are within the province of the fact-finder. *Walters v. Est. of Dockman*, 2025 Ark. App. 595, at 12, 728 S.W.3d 790, 798. The circuit court weighed the testimony and evidence and found that the Pikes established their burden of proof for boundary by acquiescence. We are not left with a definite and firm conviction that a mistake was made, and we therefore hold that the circuit court did not clearly err in its finding.

IV. *Jerry's Counterclaim*

For his second point on appeal, Jerry contends that the circuit court erred in denying his counterclaim seeking to set aside the Pikes' quitclaim deed to their son as a cloud on Jerry's title. Because we affirm the circuit court's boundary-by-acquiescence finding, we need not address this argument.

Affirmed.

HARRISON and TUCKER, JJ., agree.

*Laws Law Firm, P.A.*, by: *Hugh R. Laws*, for appellant.

*Morgan Law Firm, P.A.*, by: *Melanie Maddox*; and *Blair & Stroud*, by: *Barrett S. Moore*, for appellees.